**Arthur Strilky, Plaintiff-Appellant, v. Isador H. Levy, et al., Defendants-Appellees.**

**Gen. No. 48,198.**

First District, First Division.

November 27, 1961.

Rehearing denied January 11, 1962.

 

Jacob Levy, of Chicago, for appellant.

Gottlieb and Schwartz, of Chicago (Claude A. Roth and Charles D. Stein, of counsel), for appellees.

MR. JUSTICE BURMAN delivered the opinion of the court.

This is a chancery action seeking to establish an oral express trust between plaintiff's deceased mother, Miriam Strilky, and her brother, Isador H. Levy, with plaintiff, Arthur Strilky, as the beneficiary. As relief, plaintiff prayed that the court set aside the transfer of certain shares of stock, or in the alternative, that he be awarded the market value of said shares, and that defendant be forced to account for all dividends paid thereon. The Master in Chancery found that plaintiff failed to establish his cause of action by a preponderance of the evidence and recommended that the suit be dismissed for want of equity. Plaintiff has appealed from the decree approving the Master's Report, overruling the exceptions filed thereto, and dismissing the complaint.

The undisputed facts leading up to the controversy in question are as follows:

Defendant Isador H. Levy * was one of the organizers of Central States Finance Corporation, which was engaged in financing automobiles, and was president and general manager of that company. Louis Strilky, father of the plaintiff and brother-in-law to Levy, became associated with Levy in that company in 1926, and later served as its secretary and assistant general manager. In 1931 Levy organized the Liberty Loan Corporation, which engaged in the business of making small loans and automobile loans, and became president and general manager with Louis Strilky as its vice president and assistant general manager.

Miriam Strilky, Levy's sister and mother of the plaintiff, was the owner of record of a certificate for 350 shares of the Liberty Loan class "B" stock. In 1947 a new certificate for 50 shares was issued in Miriam's name, and a certificate for 300 shares was issued in the name of Levy's daughter, Harriet. Miriam's 50 share certificate was placed in a strong box in her husband's office. The disposition of the remaining 300 shares is the subject of much conflicting testimony. Plaintiff contends that Levy accepted the original 350 share certificate of Liberty "B" stock, endorsed in blank by plaintiff's mother, upon the express oral agreement that Levy would hold 300 of those shares in trust for plaintiff's benefit, but that despite his promise Levy transferred the stock to his daughter, Harriet.

The Master found contrary to this claim of an oral trust, and plaintiff asserts that the Master's conclusions and recommendations, approved by the Chancellor, are against the manifest weight of the evidence.

---

* Isador H. Levy died on December 1, 1960. Pursuant to an order of this court, the executor of Levy's estate was substituted as defendant-appellee.

■■ At the outset, plaintiff argues that this court is not bound by the rule that the Master's findings must be accepted so long as they are not against the manifest weight of the evidence. On the contrary, says plaintiff, while the Master's report is considered to be prima facie correct, it does not carry the weight of a jury verdict, but rather is advisory in nature, and all the facts are open for consideration, in the first instance, by the Chancellor, and on appeal, by the court of review. It is the established law that when exceptions to a Master's Report are sustained by the Chancellor the "manifest weight" rule does not apply, and all the facts are open for consideration on review. The reason is that the Chancellor did not see and hear the witnesses, and therefore was in no better position than is the court of review to determine the credibility of the witnesses. (Uksas v. Zelensky, 21 Ill2d 303, 172 NE2d 359; Stasch v. Stasch, 355 Ill 581, 189 NE 891; Kosakowski v. Bagdon, 369 Ill 252, 16 NE2d 745; Thatcher v. Kramer, 347 Ill 601, 180 NE 434.) In the Uksas decision the Supreme Court, in reversing the Chancellor and approving the findings of the Master, noted that "while the rule is that the Master's findings on controverted facts do not carry the weight of a jury verdict in a suit where trial by jury is a matter of right, yet such findings are advisory [citation], and thus are entitled to much consideration. . . . [I]t is our duty to make our own independent determination of the facts, giving due consideration to the findings of the Master, who heard and saw the witnesses, since the factual conclusions here depend upon an appraisal of the credibility of conflicting testimony." It is quite a different situation where, as in the instant case, the Chancellor approves the Master's findings. Under such circumstances the matter on appeal is viewed in a light comparable to

the situation where the Chancellor himself heard and saw the witnesses and made findings of fact. We will not disturb the Master's findings where approved by the Chancellor unless they are manifestly against the weight of the evidence. (People v. La Salle St. Trust & Sav. Bank, 5 Ill App2d 261, 125 NE2d 654; Schmalzer v. Jamnik, 407 Ill 236, 95 NE2d 347; Finley v. Felter, 403 Ill 372, 86 NE2d 188.) With this rule in mind we have examined the voluminous record in some detail.

Louis Strilky testified that in September of 1946 Levy remarked that his wife, Virginia, was coming down to the office shortly and he warned Louis, "you better go out because she is going to raise a lot of hell again." Strilky left his office and on his return found a note from Virginia demanding that Miriam's stock be taken out of her name. He testified that he showed Levy the note and the latter advised him to forget about it. He said Virginia called him that night to inquire whether he discovered the note, and when he replied in the affirmative she threatened, "you better get that stock down here and transfer it out of Miriam's name. I don't want her as a stockholder in Liberty Loan Corporation or I will have you beaten up." He testified that in many previous conversations between them she had told him she didn't want Miriam as a stockholder and he had replied that it was none of her business. Strilky further testified that in the latter part of December of 1946, or January, 1947, pursuant to a phone call from his wife, he removed from his strong box the certificate for 350 shares of "B" stock, which was assigned in blank by Miriam, and upon giving it to Levy the ensuing conversation took place:

Strilky: "Miriam called me this morning and wants me to give you the certificate of 350 shares of B stock. . . . What is all this about?"

Levy: "I talked to Miriam last night and Miriam wanted to put 300 shares of B stock in trust with some bank for Buddy [the plaintiff, Arthur Strilky]. I said, 'why go to all that trouble and expense? Let me hold the stock and if something happens to you I will see that Buddy gets it and any time you want the stock returned you may have it.'"

Strilky testified that shortly after leaving this certificate assigned in blank with Levy he found a new certificate for 50 shares of "B" stock in Miriam's name on his desk, and he followed the usual procedure of having Miriam assign it in blank and placing the certificate in his strong box.

Plaintiff, Arthur Strilky, who was employed by Liberty as supervisor of several of its branches in Chicago, testified that when Levy was at the Strilky home during the holidays of December, 1946, plaintiff's mother told Levy that she was going to place 300 shares of "B" stock with a bank in trust for Arthur, and Levy suggested, "why go to all that time and trouble and expense? . . . I will hold the stock for Bud [plaintiff]. Any time you want it back, you can have it. In the event that anything happens, I will make sure that he gets it." Plaintiff testified that his mother replied something like "oh, that is a good idea, I will think it over, I.H." Plaintiff stated that a short time later his mother told him that she had given the certificate in question to Levy to be held in trust for him [Arthur].

Arthur Strilky also testified that there were no other conversations with his mother while she was living, or with Levy, about the stock. He stated that shortly after his mother passed away in October of 1951, he, for the first time, told Levy that he wanted the "B" stock returned. He testified that on a number of occasions during the years 1952, 1953 and 1954, he made similar demands of Levy, who advised him to wait

96

because there was a pending deal to sell all of the "B" stock held by the Levy and Strilky families which would benefit plaintiff. Arthur said he agreed to wait. He testified further that in July, 1954, and on several occasions in 1955, he asked Levy to return the stock since the company had been sold, and Levy explained that a law suit was pending that might upset the deal and that he should wait, which plaintiff agreed to do. No other persons were present during any of these conversations. Plaintiff stated that in the fall of 1955 he and his uncle, Dr. Strilky, met with Levy in a restaurant, and when plaintiff demanded the stock Levy told him to be patient a while longer. Plaintiff stated that Dr. Strilky urged that they get together and settle their matter amicably. Dr. Strilky corroborated the testimony concerning the meeting.

Defendant Levy testified that in 1939 he gave his sister, Miriam, 1000 shares of "Central" stock which was later converted to 300 shares of Liberty "B" stock; [*] that Miriam phoned him around December, 1946, and said that since the 300 shares of stock that he had given her rightfully belonged to his daughter Harriet she would like to give it to her; that he told Miriam it wasn't necessary, but a few days later Miriam called again and said that she had talked with her husband about giving the stock to Harriet and that her husband would take care of it; that on January 7, 1947, Louis Strilky told Levy, "here are the 300 shares of stock that Miriam gave to Harriet" and also handed him a certificate made out to Miriam for 50 shares of stock; and that after he signed the

[*] Central States owned all of the class "B" stock of Liberty Loan, which constituted the controlling shares of that company, and upon Central's dissolution in 1940 the "B" stock of Liberty was distributed to the shareholders of Central States on an exchange ratio of 3 shares of Liberty "B" stock for every 10 shares of Central States.

certificates, as president of Liberty, he returned the 50 share certificate to Louis who took it with him.

Levy further testified that the first time he heard of plaintiff's claim against him was in the latter part of November, 1955, when plaintiff's father told him that his son, Arthur, would sue him for the 300 shares of stock; that plaintiff came to his office in December of 1955 and said that plaintiff's father found a note written by Levy's wife "in which duress was used to get the stock away from mother," and that since plaintiff was his mother's heir the stock belonged to him; that Levy replied that he originally gave the stock to plaintiff's mother, but that she felt that the stock rightfully belonged to Harriet, and since she and her husband had plenty of stock she desired to give it to Harriet; that in January, 1956, Levy met with plaintiff and his uncle, Dr. Strilky, at the latter's request; that at the meeting Dr. Strilky reiterated plaintiff's claim based on duress and Levy again explained that the stock was given by him to plaintiff's mother, but she later gave it back to his daughter, Harriet; that plaintiff then said that he was going to sue; and that neither plaintiff nor anyone else ever mentioned to him that plaintiff claimed the stock by reason of a trust agreement until the instant suit was filed.

Plaintiff contends that the Master erred when he failed to make a specific finding as to the existence of a fiduciary relationship between Levy and plaintiff's mother. Plaintiff claims also that the Master and the Chancellor erred in fixing the burden of proof entirely upon him. Plaintiff's theory is that he introduced evidence sufficient to establish the alleged fiduciary relationship, and upon so doing, the burden shifted to defendants to prove the propriety and fairness of the transaction. Moreover, as the defendants sought to

explain the transaction on the basis of a gift, the burden was on them to prove the gift by unequivocal and convincing evidence.

■■ We cannot agree with plaintiff's view of the law. One seeking to establish an express trust by parol evidence, as plaintiff here attempts to do, bears the burden of proving the trust by clear and convincing evidence. (Keuper v. Mette, 239 Ill 586, 88 NE 218; Reynolds v. First Nat. Bank of Chicago, 279 Ill App 581; Sharp v. Sharp, 328 Ill 564, 160 NE 140.) In Smith v. Baxter, 239 Ill App 453, 457, 458, a case quite similar to the instant one, the court held that since the complaint averred an oral express trust "the burden . . . was on him to establish the trust as he had in his bill stated it. . . . Otherwise expressed, complainant cannot prevail unless, on consideration of all the evidence, it must be said it not only clearly and satisfactorily supports the claim of a trust, but is inconsistent with every other reasonable claim put forth against a trust." The existence of a fiduciary relationship would not shift the burden of proof *where an express trust is alleged.* While such a relationship is material where the plaintiff advances a theory of undue influence or a constructive trust theory (Hofert v. Latorri, 22 Ill2d 126, 174 NE2d 866), where, as in the instant case, the plaintiff bases his claim solely on the existence of an express trust, it readily can be seen that the plaintiff might establish the fiduciary relationship and still fail to prove the express trust together with all its terms and conditions.

Likewise, plaintiff's burden to prove the express trust is in no way lessened by defendants' assertion of a gift. Plaintiff's theory on this point was asserted in Smith v. Baxter, 239 Ill App 453, and flatly rejected by the court. Though the defendant's evidence in sup-

port of a gift might in a given case be unconvincing, the plaintiff is not given the benefit thereby of a conclusive inference that he had established his case. He must still show by unequivocal and unmistakable evidence the existence of the express trust. The holding in Head v. Wood, 20 Ill App2d 97, 155 NE2d 348, urged by plaintiff, to the effect that one asserting a gift has the burden of proving it, is inapposite since that case was decided on the theory of undue influence and not on the basis of an express trust.

We turn then to consider whether the conclusion of the Master, confirmed by the Chancellor, that plaintiff failed to establish his claim of a parol express trust, is against the manifest weight of the evidence. The Master filed a careful report detailing the essential facts considered by him in reaching his findings. We found this report very helpful to us.

The only person who could create a trust was Miriam. Outside of the uncorroborated testimony of plaintiff and his father we have no acts or circumstances on the part of Miriam which tend to show a trust. The stock in question was transferred out of Miriam's name at her direction in January, 1947, with her husband's assistance, and possession of the stock remained in defendants until the suit was instituted in 1956. Although dividends were paid on that stock during this period, neither plaintiff nor his father, who was vice president of Liberty, made any claim or demands on the company for the dividends.

The evidence revealed that Louis Strilky had the certificate for the 350 shares of "B" stock belonging to Miriam in his strong box and that the stock was assigned in blank by Miriam. All of Miriam's stock was entrusted to Louis in that manner. Louis Strilky, by his own version, gave the stock to Levy on Miriam's command without any explanation or mention of a

trust by her. There were no strained relations between Louis Strilky and his wife, and none of the parties contend that Miriam was incompetent to handle her own affairs. The stock she gave to Harriet was originally a gift to Miriam from defendant Levy. Upon relinquishing the 300 shares, Miriam and her husband still owned considerable stock in the company. When, on an occasion prior to the incident in question, Miriam desired to give plaintiff some stock, she made the gift in an outright fashion—not in the form of a trust.

The Master found that there were many improbabilities as to the existence of a trust which were raised by the evidence, such as the inconsistency between plaintiff's present claim and his verified claim of 1956, as administrator of his mother's estate, based on the premise that the trust was created "for the benefit of his mother"; the statement of Louis Strilky that he was unaware of his wife's purpose when he gave her stock to Levy and that his wife had not discussed the matter with him, either before or after he turned over the stock; the absence of clear evidence of any demands by the plaintiff toward Levy in the presence of others until 1955; the failure to explain why plaintiff's mother would want to create a trust for him instead of making an outright gift of the shares to him, since prior thereto and afterward, direct assignments of stock were made to plaintiff by his parents; the failure of Louis Strilky to mention the interest of plaintiff in the option agreement signed by Louis on July 8, 1954, for the sale of his shares to the Key Finance Company, where Louis represented that the ownership of the class "B" shares of Liberty then was: Louis Strilky, 2018; Virginia Levy, 3119; I. H. Levy, 1196; Harriet Levy, 551; H. H. Levy, John J. Levy and Margaret Levy, 357, totalling 7241 shares out of a

101

total of 7500 shares issued; the fact that after the "B" stock was sold plaintiff consulted another attorney before this suit was brought and claimed that Levy obtained the stock by duress—which is not the theory of plaintiff's present complaint; and the existence of evidence to the effect that when Miriam transferred the "B" stock in 1947 the market value was considerably less than the price at which the "B" stock was sold to the Key Finance Company in 1954.

Plaintiff introduced considerable evidence in an attempt to reflect on the credibility of defendant Levy. It is the province of the Master, who alone heard the testimony, to pass initially on the credibility of the witnesses. In light of all the circumstances surrounding the transaction in question we are of the opinion that the Master's appraisal of the credibility of witnesses, and the finding of the Master and the trial court that plaintiff did not establish an oral express trust, are not against the manifest weight of the evidence.

Finally, plaintiff argues that the fees allowed the Master in Chancery were excessive and unreasonable. The Master specifically itemized his charges. In addition to statutory fees of $314.10, the Master expended sixty-four hours and charged $30 per hour for his services, bringing his total charges to $2234.10. In the objections to the Master's Report plaintiff generally stated that "the Master made excessive charges for his services." Nowhere in the record are there any specific items cited as excessive. Plaintiff did not request a hearing on the charges, and failed to introduce any evidence to support his contention that the fees were excessive. The Chancellor was able to determine from the certificate of charges whether or not the fees were reasonable and proper. The Master's hearings are conducted in his private law office. In the light of the higher costs of operating a law

office today, particularly in Chicago, and considering this complex, contested hearing involving 1974 pages of record, we cannot say that the Chancellor abused his discretion in allowing the Master's fees.

The decree of the Circuit Court is affirmed.

Affirmed.

MURPHY, P. J. and ENGLISH, J., concur.