Gretchen Levy Gossett, et al., Plaintiffs-Appellants, v. Virginia K. Levy, as Executrix of the Estate of Isador H. Levy, Deceased, and Liberty Loan Corporation, Defendants-Appellees.

**Gen. No. 48,658.**

First District, First Division.
January 18, 1963.
Rehearing denied April 4, 1963.

Jacob Levy, of Chicago (Arthur Frankel, of counsel), for appellants.

Dallstream, Schiff, Hardin, Waite & Dorschel, of Chicago (Albert E. Hallett, of counsel), for appellee, Liberty Loan Corporation; Gottlieb and Schwartz, of Chicago (Claude A. Roth, and Charles D. Stein, of counsel), for appellee, Virginia K. Levy.

MR. PRESIDING JUSTICE BURMAN delivered the opinion of the court.

This is a chancery action by Gretchen Levy Gossett and her four children, Judith Levy Russell, William Isaac Levy, Albert Ladd Levy and Morris Alexander Levy, seeking to establish an oral express trust between the children's deceased father, Melvin A. Levy, and

---

* See Callaghan's Illinois Digest, same topic and section number.

448

Melvin's older brother, Isador H. Levy.* The trust was alleged to have been established in 1940, when Melvin transferred to Isador a certificate, endorsed in blank, evidencing ownership of 334 shares of Class "B" stock in defendant Liberty Loan Corporation. Liberty had been organized by Isador in 1932 and a substantial majority of the Class "B" stock was owned by the Levy family until 1954, when the stock was sold to another finance company. Isador was President of Liberty from its inception until 1954. At the time of his death, in May, 1942, Melvin was an employee of Liberty.

Reference was made to a Master in Chancery, who, after a hearing on the issues raised, found that plaintiffs had failed to establish the alleged trust by a preponderance of the evidence and recommended the suit be dismissed for want of equity. Exceptions to the report were overruled by the Chancellor and the case was dismissed. Plaintiffs now appeal.

Plaintiffs' assertion that a trust had been established was supported by the testimony of two witnesses at the hearing before the Master: Gretchen Levy Gossett and Louis Strilky, a brother-in-law of Isador.

Strilky's testimony was that in December of 1939, Melvin brought to the Liberty office certificate number 24, which was for 334 shares of Liberty Class "B" stock. He asked Strilky, who was then an officer of Liberty, about transferring ownership of the stock to Gretchen and the four children. Strilky said he told Melvin to see Isador, and a short time later, Strilky said Melvin told him that Isador was going to hold the shares in trust for the benefit of Gretchen and the children in the event anything should happen to him

---

* Isador H. Levy died December 1, 1960, after all proofs in the case were closed, but prior to the Master's report. Levy's widow, as executrix, was, pursuant to court order, substituted as a defendant. For purposes of this opinion, we shall refer to Isador H. Levy as defendant.

449

(Melvin). This was the extent of Strilky's testimony concerning the alleged trust. On cross-examination, Strilky admitted he was a witness in another lawsuit (then still in litigation) between his son and Isador, wherein his son had sued Isador in an effort to establish an oral trust concerning Liberty stock. (See Strilky v. Levy, 33 Ill App2d 91, 178 NE2d 694.) Strilky testified he first met Gretchen at Melvin's funeral. He said he next saw Gretchen in the Liberty office in 1949, but no conversation took place between them. He further testified that Gretchen telephoned him in 1958, "to find out how I was feeling and how Isador was." He said he told her he had not talked to Isador for quite a while and that, "we had a little trouble with Isador, my son did." He then informed her of the litigation between his son and Isador. By his own testimony, Strilky never talked to Gretchen about the alleged trust and had not talked to Isador since 1955.

Gretchen's testimony was as follows:

She met Melvin in the later 1920's when they both worked at the Joliet office of Central States Finance Corporation (the predecessor of Liberty). In the fall of 1929, Melvin returned to Chicago and a short time later, was joined by Gretchen. They lived together at various places in Chicago until 1936, when they moved to a farm in Monticello, Indiana. The other four plaintiffs were born between 1932 and 1940. Melvin and Gretchen rented the farm until 1939, when Melvin purchased it on contract for $8,000. From 1936, until his death in 1942, Melvin divided his time between Chicago and Monticello; the weekdays were spent in Chicago and the weekends in Monticello with Gretchen and the children. Gretchen testified that Melvin kept the certificate for 334 shares of Liberty in a metal box at the farm until some time before his death, when he took the certificate to Chicago. Melvin died suddenly, of a heart attack, May 31, 1942. At this time his children

ranged in age from two to eight years. A week after Melvin's death, Isador, accompanied by another brother, Harry, went to the farm in Monticello to pick up a company car Melvin had taken to the farm. While they were at the farm, Isador had a conversation with Gretchen, and in the course of that conversation, Gretchen said she inquired about the stock. She said Isador told her that they were not to get the stock until the youngest child reached twenty-one. Gretchen insisted that Melvin told her that, "he turned the certificate over to [Isador] to hold in trust for her and the children and that in the event something happened to him, [Isador] was to turn the certificate over to her and the children." Gretchen then expressed concern as to how she and the children would manage. Isador told her he would make arrangements to help Gretchen maintain her family and home. Nothing further was said about the alleged trust.

Gretchen said she next spoke to Isador about the trust in 1949, when she said she went to Chicago to see Isador about borrowing $1,000. She said she told Isador she wanted to use the stock as collateral for the loan but that Isador told her Liberty did not make loans on stock. Arrangements were then made to allow Gretchen to borrow $1,000 on her automobile. Gretchen said she next contacted Isador about the trust in 1954, when she learned, from her sister, that Liberty had been sold to another firm. She asked Isador, "what about the money for the stock," and she stated, Isador told her that only the Class "B" stock was being sold, but that no money would be available for at least two years because the sale was the subject of litigation. Finally, in 1959, she said she learned of the litigation between Strilky's son and Isador and after contacting Strilky's attorney, this suit was instituted.

Defendants' explanation of the transfer of stock consisted primarily of Isador's testimony. However,

451

his testimony was substantiated by the testimony of Tessie Levy (Melvin's wife), Harry Levy (Melvin's and Isador's brother), Samuel C. Simons (an ex-employee of Liberty) and Norman D. Curtis (the auditor of Liberty's books).

Isador's testimony was as follows:

He refuted only one part of Gretchen's testimony as to what transpired prior to 1939. Isador said that Melvin, after he left the Joliet office of Central States, briefly worked for another loan company, and while employed there, was threatened with prosecution for failure to account for company funds. Isador said he made a personal loan to Melvin to make up the shortage and the threatened prosecution was avoided.

In July of 1939, when Melvin decided to purchase the farm in Monticello, he asked Isador for a loan of $1,500 to use for a down payment. It was agreed that Melvin would get a $1,500 loan from Liberty in return for Melvin's collateral note for that amount with Melvin's stock in Liberty to be the collateral. This was done, the collateral being delivered in January of 1940. (In 1939, Central States was being liquidated; Central stock being replaced with Liberty stock. Melvin owned 1,000 shares of Central stock for which he received the 334 shares of Liberty. The liquidation proceedings were the cause of the delay in delivering the collateral.) At the time of Melvin's death in 1942, there was a balance due of over $800 on this note.

In February of 1942, Melvin asked Isador for a loan of $1,000 to use for the purchase of cattle for the farm. This loan was also made by Liberty, Melvin executing a promissory note for the amount. This loan was unpaid at Melvin's death and Liberty's records show it was written off as uncollectable in 1943. In addition to the above loans, Isador testified that he had, over the years, loaned Melvin small sums of money and that, in 1942, these loans totaled approximately $3,000.

Shortly before Melvin's death, in early May of 1942, Melvin had a conversation with Isador with regard to his debts. It was finally agreed that Isador would cancel the personal debts and pay off the balance due liberty on the $1,500 loan and, in return, Melvin would transfer to Isador the 334 shares of Liberty stock. This was done. Tessie Levy testified that Melvin had told her that he intended to make such an arrangement.

To support the above testimony, defendants offered in evidence the records of Liberty which showed that the $1,500 loan had been secured by the stock. The auditor testified these accounts were true. Isador also produced cancelled personal checks for over $300 to support his testimony that he had made personal loans to Melvin.

Isador denied having the conversation with Gretchen concerning the alleged trust in 1942. He said that prior to Melvin's death, he neither knew of Melvin's relationship with Gretchen nor of the four children. He admitted that, together with his brother Harry, he had gone to the farm the week after Melvin died to pick up the company car, but both he and Harry denied that anything was said by Gretchen about a trust. Isador testified that the first time he ever heard anything about the alleged trust was in 1959, when he was testifying before another Master in the case of Strilky v. Levy, 33 Ill App2d 91, 178 NE2d 694. Prior to that time he said none of the plaintiffs had ever made any demands upon him or Liberty. He denied having the conversation with Gretchen concerning the trust when Gretchen made the $1,000 loan in 1949. Samuel Simons, who was an employee of Liberty at the time the loan was made, testified that he made the arrangements for the loan. He denied that Isador had anything to do with the loan. He said Gretchen never came to the Liberty office, but rather, all arrangements were made by mail.

453

To support defendants' contention that the transfer of stock was made to settle Melvin's indebtedness to Isador and Liberty, Isador offered in evidence receipts showing that in 1942, he had purchased Class "B" stock in Liberty in the open market, for $4 per share. Plaintiffs, who place a value of $250,000 on the stock today, contend the stock was worth much more than $4 per share in 1942, but they offered no evidence to support this. They contend the receipts do not establish the value of the stock in 1942. In Johnson v. Niles Invisible Door Check Co., 222 Ill App 65, 69, the court said:

> The fair cash market value of unlisted stocks can be established by the testimony of anyone dealing in such stocks who is qualified to give an opinion. This is one of the accepted standards for determining values in such cases.

 It would unduly prolong this opinion to set out in detail the Master's findings. His findings are substantially in accord with, and are supported by, the testimony and evidence introduced by defendants. Specifically, the Master found that while employed by Central States Finance Company, which controlled Liberty Loan Corporation, Melvin had married Tessie Hickey April 30, 1918, that Melvin and Tessie were never divorced; that while working for the Joliet office of Central States, Melvin met Gretchen Baumgarten (now Gretchen Gossett); that Melvin lived in Chicago with his wife, but made it a practice to spend his weekends in Monticello, Indiana where he cohabited with Gretchen; that Melvin told his wife that he was spending the weekends in Ottawa, Illinois; that Melvin and Gretchen never participated in any marriage ceremony, religious or civil; that two years after Melvin's death, Gretchen married a man named Gossett. Finally, the

Master found that plaintiffs had failed to prove the transfer of stock was effected to establish a trust for the benefit of the four plaintiffs.

■ The Master's findings included a finding that plaintiffs had failed to establish a confidential relationship between themselves and Isador. The Master made no finding as to any confidential relationship between Melvin and Isador. Plaintiffs, on this appeal, admit there was no allegation as to any confidential relationship between themselves and Isador, but contend the Master erred in failing to find a confidential relationship between Melvin and Isador. The issue of a confidential relationship between the settlor and trustee is material when the plaintiff advances a theory of undue influence or a constructive trust. Hofert v. Latorri, 22 Ill2d 126, 174 NE2d 866. However, plaintiffs here base their claim on an express trust. Even if a fiduciary relationship between Melvin and Isador were established, plaintiffs would not improve their case for they would still have the burden of showing, by clear and convincing proof, that the trust was, in fact, established as alleged. Smith v. Baxter, 239 Ill App 453, 457–8; Strilky v. Levy, 33 Ill App2d 91, 99, 178 NE2d 694, and cases cited therein.

When a trust is attempted to be established by parol evidence, "[t]he proof must be clear, convincing and so strong, unequivocal, and unmistakable, as to lead to but one conclusion, and if the evidence is doubtful or capable of reasonable explanation upon any other theory, it is not sufficient." Maley v. Burns, 6 Ill2d 11, 18, 126 NE2d 695.

■ When, as here, the findings of the Master have been confirmed by the Chancellor, such findings will not be disturbed unless. manifestly against the weight of the evidence. Strilky v. Levy, 33 Ill App2d 91, 178 NE2d 694; People v. La Salle St. Trust & Sav. Bank, 5 Ill App2d 261, 125 NE2d 693.

Reviewing plaintiffs' evidence, they were able to prove one uncontroverted act: the transfer of the 334 shares of Liberty stock from Melvin to Isador. They assert this was effected to establish a trust with themselves as beneficiaries. Their proof that the transfer was made for this purpose, which the law requires to be "clear, convincing, strong, unequivocal and unmistakable," consisted of the testimony of two persons, Strilky, whose son had a pending lawsuit against Isador, and Gretchen, one of the beneficiaries of the alleged trust. Strilky's testimony consisted solely of his relation of a conversation alleged to have taken place almost twenty years prior to the litigation. Except for this conversation, he never heard anyone, including Gretchen and Isador, ever mention the alleged trust.

Gretchen's sole proof as to the existence of the trust was her recitation of a conversation she had with Melvin. By her own testimony, in the seventeen years between Melvin's death and the institution of this litigation, she had only three conversations with Isador, the alleged trustee, concerning the trust. During this long period, she neither wrote to nor received from Isador anything in writing in which the trust was mentioned. No one, other than she and Isador, was ever present during the three conversations. In 1954, when Gretchen learned of the sale of the Class "B" stock by Liberty to another firm, including the stock representing the corpus of the alleged trust, she took no action to protect her own interests, even though, by her own testimony, she learned that other owners of Class "B" stock were litigating the sale. Admitting that no confidential fiduciary relationship existed between herself and Isador, she testified she accepted without question Isador's statement that no money would be forthcoming for two years. Further, at the end of the two-year period, she still took no action to

protect her rights. During the next five years, by her own testimony, she did not contact Isador even once to inquire about the money. It seems very strange indeed in face of the fact that Gretchen claimed Melvin told her that she and the children were to get the stock in the event of his death, that for eighteen years thereafter, she made no demands either for the stock itself or for any of the dividends declared by Liberty. In addition, Gretchen's testimony failed to disclose that anything was ever said as to how the alleged trust was to be administered, the specific terms of the trust or the quantity of interest as between Gretchen and the four children.

The Master, who had the benefit of seeing and hearing the witnesses, and of observing their conduct while testifying, had this to say about the testimony of Gretchen. . . "[I]t stretches the credulity of the Master to the breaking point to ask him to accept her testimony that Melvin told her that the 334 shares of Class B stock of Liberty were held in trust for her and her children, in the face of her remaining silent and passive for 18 years, during which time this woman, who had worked in a finance company office and who had been a business executive must have known that the dividends were being declared and paid on said stock. She did not, in all those 18 years, demand any accounting from the alleged trustee. . . Her denial of her knowledge that Melvin was legally married to Tess Levy during the many years in which she lived in her community as Melvin's wife, and her children bore his name, while understandable, is entitled to no credence whatsoever. . ."

Even if plaintiffs' testimony, standing alone, unrebutted, met the legal requirement that an oral trust must be established by clear and convincing proof, Harris Trust & Sav. Bank v. Morse, 238 Ill App 232, defendants' testimony and evidence, which is a reason-

able explanation of what occurred, would cause the alleged trust to fail. Maley v. Burns, 6 Ill2d 11, 126 NE2d 695.

■ Finally, plaintiffs object to the Master's charges for services and fees totalling $4,670.85. The Chancellor sustained plaintiffs' objection to a requested charge of $1,557 for abstracting the record and he reduced the fees to $3,113.35. Plaintiffs contend the Master's charges, as reduced, are still excessive. We have examined the objections and conclude the fees and charges, as determined by the Chancellor, are both reasonable and fair.

We have examined the voluminous record and have concluded that the findings and conclusions of the Master, confirmed by the Chancellor, are not manifestly against the weight of the evidence. Therefore, the decree is affirmed.

Affirmed.

MURPHY and ENGLISH, JJ., concur.