Nicholas T. Kioutas, et al., Plaintiffs-Appellees, v. City of Chicago, a Municipal Corporation, Defendant-Appellant.

Gen. No. 49,688.

First District, Third Division.

May 20, 1965.

Rehearing denied June 18, 1965.

John C. Melaniphy, Corporation Counsel, of Chicago (Sydney R. Drebin and Harry H. Pollack, Assistant Corporation Counsel, of counsel), for appellant.

Maurice J. Nathanson and Robert S. Bremer, of Chicago (Allen Hartman, of counsel), for appellees.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This is an appeal from a judgment declaring that plaintiffs have the right to erect a 40-unit apartment building on premises zoned single family residential, and that defendant's zoning ordinance as applied to said premises is void. The case was appealed directly to the Supreme Court and was transferred to this court.

The issues presented are that the plaintiffs cannot maintain this action because none of them has sufficient interest in the subject property to erect an apartment building thereon, and that the trial court erred in holding City's zoning ordinance void, as applied to the subject property.

The subject property consists of three lots numbered 1, 2 and 3. The complaint alleges that lot 1 is owned by plaintiff Louis Spirrison; that lots 2 and 3 are

owned by plaintiffs Nicholas T. Kioutas and Golfo Kioutas, his wife; that plaintiffs Leonard D. Falcone and Bernard R. Grizoff, Jr. are contract purchasers of the subject property, and that plaintiffs propose to erect an apartment building containing between 30 and 40 three and four-room apartments on the property.

The subject property is in an R1 single family residence district, the permitted uses for which are set forth in section 7.3–1 of the May 29, 1957 Amendment to the Zoning Ordinance of the City of Chicago (Municipal Code of Chicago, chap 194A, section 7.3–1) and has been so zoned since 1942. The only residential use permitted is one-family detached dwellings.

A certified copy of a warranty deed recorded June 7, 1950 showed that lot 1 was conveyed to Louis and Christine Spirrison for $10. On October 20, 1959 Louis Spirrison as seller entered into a real estate contract with Robert L. Sherman for the sale of lot 1 for $17,500. This contract was assigned on November 18, 1960 from Sherman to Leonard D. Falcone and Bernard R. Grizoff, Jr., plaintiffs herein. The consent of Spirrison is noted thereon for an extension to October 20, 1961 for consummation of the contract. As of June 17, 1963 Falcone and Grizoff had not been put in title under the contract.

Lot 1 is on the southeast corner of Harlem and Talcott Avenues. Harlem runs north and south. Talcott runs northwest and southeast. Lot 1 has a frontage of 136 feet on Harlem, 204.75 feet on Talcott to an alley east of Harlem, south on said alley for 26.8 feet, and then west 175 feet to Harlem.

Lot 2 adjoins lot 1 on the south and lot 3 adjoins lot 2 on the south. Lots 2 and 3 each have a frontage of 50 feet on the east side of Harlem and run 175 feet east to an alley east of Harlem Avenue. Lots 2

and 3 were conveyed by deed dated May 24, 1926 to Nicholas T. Kioutas for $1,948 and other consideration. On September 30, 1960, Nicholas T. and Golfo Kioutas entered into a contract as sellers and Leonard D. Falcone and Bernard R. Grizoff, Jr. agreed to purchase lots 2 and 3 for $26,690.68. A rider attached to the contract provides that if the contract is not consummated in a year it becomes null and void, and that the purchasers have the right to institute, at their own expense, necessary proceedings for the purpose of rezoning said lots. As of June 17, 1963 Falcone and Grizoff had not been put in title under the above contract.

 As to defendant's first point that the plaintiffs cannot maintain this action because none of them has sufficient interest in the subject property to erect an apartment building, we are in somewhat of a quandary as to why Louis Spirrison, Nicholas T. Kioutas and Golfo Kioutas, the holders of legal title, do not have sufficient interest in the subject property to attack the zoning. Any owner of property has a right to question the validity of a zoning ordinance restricting his use of the property. He may not be entitled to the relief he seeks, but we know of no rule of law that would prevent him from seeking relief. The defendant argues that since the contract purchasers are the ones who desire to construct the apartment building and since the record is not clear as to whether their contracts are still in force, that none of the plaintiffs in this action has sufficient interest to attack the zoning. The contract sellers as owners of the property, assuming the contracts have terminated, certainly have a right to question the validity of the zoning ordinance whether they do or do not propose to construct a 30 or 40 apartment building on the premises. Furthermore, that issue was not raised

■■■■■■■■■■■■■■

in the trial court. In the defendant's objections to the master's report the defendant objected to paragraph third of the report in the following language:

"1. To the finding stated in paragraph 'third,' page 8, that plaintiffs Spirrison and Kioutas are legal owners of the subject property. The evidence is that such ownership is subject to a contract right to purchase said property by Leonard Falcone and Bernard Grizoff, and, further, that the real parties in interest in this suit are Falcone and Grizoff; and they are the parties who propose to use the subject property."

After hearing objections to the master's report the master sustained the foregoing objection 1. The defendant by this objection induced the master to find that the property was subject to a contract right held by Leonard Falcone and Bernard Grizoff. It is a fundamental rule of law that a party cannot invite error and later complain of the same error. If the contracts held by Falcone and Grizoff had expired, the defendant should have raised that point during the trial of this case before the master, and should not have invited the master to change his report to reflect that the ownership is subject to a contract right held by Falcone and Grizoff to purchase the property, and also should not have invited the master to change his report to read that the real parties in interest were Falcone and Grizoff. A party will not be permitted to argue on appeal a defense not interposed by his answer, nor can the theory upon which a case is tried be changed upon review. While an appellee is not limited in the scope of the review as is an appellant, nevertheless, the review cannot go beyond the issues appearing in the record. Consoer, Townsend & Associates v. Addis, 37 Ill App2d 105, 185 NE2d 97;

Bergmann v. Multi-State Inter-Ins. Exchange, 39 Ill App2d 468, 189 NE2d 49.

During the hearing before the master defendant's attorney made the following statement: "I don't, by virtue of this line of questioning, question the right to sue. I do not question the right to sue at all."

 Under the law and the facts as presented to us, the plaintiffs' right to maintain the action cannot be questioned for the first time on review.

It will be necessary to set forth additional facts brought out at the hearing in order to decide the second point urged by the defendant.

The subject property is in a block bounded by Talcott Avenue on the north, Bryn Mawr Avenue on the south, Neva Avenue on the east, and Harlem Avenue on the west. On the Harlem Avenue side of said block, being the east side of Harlem, there are 19 lots, 12 of said lots are improved with single family residences, two of which are new and not yet occupied. One of the single family residences was converted to two apartments and is occupied by two families. The record fails to show when such conversion took place, and whether such nonconforming use is legal. The vacant lots on the Harlem Avenue side are the three that make up the subject property and four at the south end adjacent to Bryn Mawr Avenue. The dimensions of 18 of the lots are 50 feet by 175 feet. Lot 1 of the subject property has irregular dimensions. There are no lots fronting on Bryn Mawr Avenue in this block. The Kennedy Expressway, then called the Northwest Expressway, adjoins Bryn Mawr Avenue on the south. On the Talcott side of said block there is an unopened alley east of the subject property. Adjoining said alley is a two-story single family residence that is occupied by two families. There is nothing in the record to show when such

residence was converted into two-family use and whether such nonconforming use is legal. Next to this building on the corner of Talcott and Neva is a single family residence. The Neva side of said block has 16 lots, 15 of which are improved with single family residences. One is vacant. The three blocks to the east of subject property are devoted exclusively to single family residences. The block to the north of subject property, across Talcott, is devoted entirely to single family residences, and the block immediately east of the foregoing block is also devoted exclusively to single family residences. The blocks to the northeast of subject property beyond the foregoing described blocks are all devoted to single family residences as far northeast as North Nickerson, with the exception of a pie-shaped parcel which is occupied by the Presbyterian Church of Norwood Park and a church school. The blocks directly north of the subject property, across North Neva Avenue and West Talcott Avenue, are occupied exclusively by single family residences with the exception of four residences which are being used by two families each. The record does not show when such uses were started or whether they are legal nonconforming uses. There are a few vacant lots in the blocks above mentioned but the area is almost completely improved with residences. In the block to the west of the subject property are Immaculate Conception Church, Passionist Fathers Academy, and a Catholic grade school. To the west of the foregoing uses are 10 lots improved with single family residences. Across the street from these 10 residences are 10 more single family residences. On the south side of Talcott, a considerable distance northwest of the subject property is Resurrection Hospital. Across Talcott Avenue to the north of Resurrection Hospital

is Resurrection Academy and High School. On the north side of Talcott, adjoining the aforesaid school grounds to the east, are a group of apartment buildings in an area zoned R–4 General Residence District, which is a permissive use in such a district.

The plaintiffs produced a city planner, who testified that in his opinion the blocks to the northeast and southeast of the block in which the subject property is located constitutes one of the finest single family neighborhoods in the city; that there exists a wide variety of "architectured" houses; that the lots are of ample dimensions, and that it is one of the more expensive single family neighborhoods in Chicago.

The block on the north side of Talcott across from the subject property contains 30 lots all of which are improved with single family residences. One of these single family residences is devoted to two-family use but there is nothing in the record to show when such use was established, and whether it is a legal nonconforming use.

All of the properties described herein, except the R–4 district adjoining the Resurrection Academy and High School grounds, are zoned either R1 or R2. R1 and R2 zoning are the same except that an R2 district does not require as much land for erecting a single family residence.

A number of property owners testified that they inquired about or knew the zoning of the property when they acquired the property, and that they relied upon that zoning before buying or building in that area.

One witness who testified for the defendant said that he was a member of the Norwood Park Citizens Association which was organized about 1875; that its purpose is to make Norwood Park a better place in which to live, and that he thought 100% of the people

in the area are opposed to rezoning of the subject property.

The buildings in the immediate area are valued at approximately between $22,000 and $37,400.

Plaintiffs' planning expert testified that in his opinion the highest and best use of the subject property is for an apartment building, while the defendant's city planning expert testified that in his opinion the highest and best use of the subject property was for single family residences.

An investigator for the zoning and buildings section of the Corporation Counsel's office, who had testified in over 650 cases involving land uses in Chicago, expressed the opinion that the intensity of use of the proposed apartment building would not be compatible with the surrounding uses; that a 1½ story brick single family residence was built on the Harlem Avenue side of the block in 1961, and that a single family residence is under construction in said block.

A witness for the city, who qualified as a real estate broker and appraiser, testified that plaintiffs' apartment building would depreciate the single family residences in the vicinity from 10 to 20 per cent, depending on their closeness to such apartment building; that under the City's zoning ordinance, five single family residences could be put on the subject property at the rate of one residence for each 6,250 square feet; that if only three residences were built, the subject property would be worth between $30,000 and $35,000.

The witness further testified that single family residence lots in the area are worth from $200 to $225 a foot and apartment building lots about $350 to $400 a foot.

Plaintiffs' real estate witness testified that to him the term "highest and best use," as applied to the subject property, meant that "if he owned the property where would he come out the best on it by putting up

450

a building or shopping or whatever might be necessary"; that if the subject property could be used for a large apartment building it would be worth $70,000, and that if the property were devoted to three residences it would be worth $21,000 or $22,000, and if devoted to four residences it would be worth $28,000.

The plaintiffs point out that there is a large complex of religious institutional structures, including a church, grammar school, convent, rectory and monastery, and a new church and grammar school under construction on property fronting on the west side of Harlem Avenue; that the present church has a seating capacity of 1,000 persons which, together with the new church now under construction, will attract some 2,500 persons to each mass, and the present grammar school has some 1,000 students enrolled. The plaintiffs also point out that the area zoned for apartment buildings on the north side of Talcott Avenue are about 1,000 feet northwest of the subject property.

Evidence was offered by the plaintiffs that in a 24-hour period traffic on Harlem Avenue reaches 26,000 vehicles per day, and that some 9,000 vehicles travel along Talcott Avenue in the same period. However, on cross-examination, it developed that the witness had taken two counts of fifteen minutes each at 5:30 p. m. and 6:30 p. m. We know that in those hours traffic is practically at its peak. He multiplied the figures he had received in those two fifteen minute periods to average out the traffic in 24 hours. When this witness was asked for the number of vehicles he counted in each of the fifteen minute intervals it developed that he had failed to bring his notes with him.

The defendant's evidence would indicate that the traffic on both Harlem and Talcott totals 24,000 cars. The testimony of a witness who resided at 5705 North

451

Harlem Avenue indicated that prior to the opening of the Northwest Expressway Talcott Avenue received traffic from the suburbs, but that now Talcott is a dead-end at Northwest Expressway, and has become just a residential street. It does not go through or across the expressway; however, there is an outlet at Talcott from the expressway for local traffic. He further testified that traffic on Talcott Avenue at the time he testified was very light.

The plaintiffs contend that the findings of the master when approved by the trial court cannot be disturbed by the reviewing court unless manifestly against the weight of the evidence. This rule has been established in Illinois by many cases, some of which are: Union Colliery Co. v. Fishback, 299 Ill 165, 132 NE 492; Pasedach v. Auw, 364 Ill 491, 4 NE2d 841; Velsicol Corp. v. Hyman, 405 Ill 352, 90 NE2d 717; Schmalzer v. Jamnick, 407 Ill 236, 95 NE2d 347; Davis v. Huguenor, 408 Ill 468, 97 NE2d 295; Spencer v. Burns, 413 Ill 240, 108 NE2d 413; Freymark v. Handke, 415 Ill 360, 114 NE2d 349; Midland Electric Coal Corp. v. County of Knox, 1 Ill2d 200, 115 NE2d 275; Rose v. Dolejs, 1 Ill2d 280, 116 NE2d 402; Johnson v. Johnson, 1 Ill2d 319, 115 NE2d 617; Rizzo v. Rizzo, 3 Ill2d 291, 120 NE2d 546; Ginther v. Duginger, 6 Ill2d 474, 129 NE2d 147; Allendorf v. Daily, 6 Ill2d 577, 129 NE2d 673; Anastaplo v. Radford, 14 Ill2d 526, 153 NE2d 37; Atkins v. County of Cook, 18 Ill2d 287, 163 NE2d 826; Wechsler v. Gidwitz, 250 Ill App 136; Zamis v. Hanson, 302 Ill App 404, 24 NE2d 59; Phillips v. W. G. N., Inc., 307 Ill App 1, 29 NE2d 849; McVeigh v. McConnell, 313 Ill App 75, 38 NE2d 962; Merschat v. Merschat, 1 Ill App2d 429, 117 NE2d 868. See also 2 ILP Appeal and Error, sec 791.

The defendant contends that the findings of the master do not carry the same weight as the verdict

of a jury, yet his findings are entitled to due weight on review of the cause. The defendant further contends that since the chancellor did not hear any testimony in open court, the reviewing court is not bound by the rule that the findings of the chancellor will not be overruled unless manifestly against the weight of the evidence. In support of defendant's theory Maley v. Burns, 6 Ill2d 11, 126 NE2d 695, and Layton v. Layton, 5 Ill2d 506, 126 NE2d 225, are cited. While these cases on their face appear to be contrary to the law advanced by the plaintiff, nevertheless, the manifest weight rule is supported by the clear weight of Illinois authority, and will be followed in this case.

The plaintiffs in this case contend that the property will be worth more if the proposed use, an apartment building, is allowed; that the traffic on both Harlem Avenue and Talcott Avenue is very great; that the property to the west, which is devoted to a church and school, and on which property a new church is being constructed, tends to intensify the traffic in the area; that the presumptive validity of a zoning ordinance is dissipated when it is shown that it results in the deterioration of property value with the absence of any reasonable basis in the public welfare requiring the restriction and its resulting loss, and that among the factors to be considered in determining the validity of an ordinance as it applies to the specific property are the relative gain to the public as compared to the hardship imposed upon the property owner.

█ The plaintiffs supported each one of their contentions by Illinois authorities, however, each zoning case must be determined on its own facts. It is fundamental that the burden is upon the one attacking a zoning ordinance to overcome its presumed validity by clear and convincing evidence. Lapkus Builders, Inc. v. City of Chicago, 30 Ill2d 304, 196 NE2d 682;

Bennett v. City of Chicago, 24 Ill2d 270, 181 NE2d 96; Cosmopolitan National Bank of Chicago v. City of Chicago, 22 Ill2d 367, 176 NE2d 795.

██ As to the plaintiffs' contention that the property will be more valuable if they are permitted to construct an apartment building on the premises, there is no doubt that the property would be more valuable, but this is likewise true in nearly every zoning case in which the use of property is limited. (First Nat. Bank of Lake Forest v. County of Lake, 7 Ill2d 213, 130 NE2d 267; People ex rel. Alco Deree Co. v. City of Chicago, 2 Ill2d 350, 118 NE2d 20.) That factor is to be considered in determining the validity of a zoning ordinance, but it is not of itself determinative particularly where the proposed use would depreciate the value of other property in the area.

In the instant case the testimony shows that the subject property, if devoted to apartment building use, would be considerably more valuable than if devoted to single-family residential use. The undisputed evidence also shows that the homes in the area would be reduced in value by reason of the construction of an apartment building. The plaintiffs contend that the property across Harlem Avenue to the west is devoted to a church and school, and that both of these militate against the use of the instant property for single-family residence. The school and church property complained of is properly in a single-family residence zoning district. While the property across the street is in an R2 district, which is a single-family residence district requiring a slightly smaller ground area per building lot than an R1 zoning district in which the subject property is located, nevertheless, the use to which the property across Harlem Avenue to the west is devoted is one that is permissible in both R1 and R2 zoning districts. Furthermore, the evidence shows that two residences were constructed on Harlem Avenue

in the same block as the subject property, one shortly before the filing of this suit and one during the hearing of said cause. The same use was then being made of the property across Harlem Avenue to the west as is now complained of by the plaintiffs.

■ The subject property is almost in the center of single family residence zoning, part of which area is zoned for R1 use and the remainder for R2 single family residence use. In the opinion of this court, to select three lots lying practically in the center of an area zoned for single family residences would be the equivalent of "spot-zoning" by the court. Furthermore the complaint about the church and school, which properly belong in a residential area, and ideally should be located in the center of a residential district is, in our opinion, unfounded.

In Bolger v. Village of Mount Prospect, 10 Ill2d 596, 603, 141 NE2d 22, 26, the court said: ". . . and the school is a permitted use in all R–1 single-family residence districts. Ideally, perhaps, the school should be located in the center of a residential district."

■ As to the argument of the plaintiffs with regard to the heavy traffic on Harlem Avenue and Talcott Avenue, the plaintiffs, Leonard D. Falcone and Bernard R. Grizoff, Jr., entered into contracts for the purchase of this property well knowing the use to which it was limited by ordinance. While a purchaser of property is not precluded from challenging a pre-existing zoning restriction, nevertheless, the purchase in the face of an existing restriction has a bearing. Harmon v. City of Peoria, 373 Ill 594, 27 NE2d 525; People ex rel. Alco Deree Co. v. City of Chicago, 2 Ill 2d 350, 118 NE2d 20.

The cases of Bolger v. Village of Mount Prospect, 10 Ill2d 596, 141 NE2d 22, and Standard State Bank v. Village of Oak Lawn, 29 Ill2d 465, 194 NE2d 201, bear many similarities to the case before us. The highest

455

amount of vehicular traffic on both Harlem and Talcott Avenues, according to the plaintiffs' witness, was 26,000 per day on Harlem and 9,000 on Talcott. The defendant's evidence showed that traffic on both Harlem and Talcott would not exceed 24,000 per day. In Bolger v. Village of Mount Prospect, supra, the plaintiff sought to have declared invalid an R1 single family residence zoning as applied to property on the corner of the intersection of Main Street and Central in Mount Prospect. The estimates of volume of traffic on Main Street alone varied from 9,000 vehicles per day to 4,000 per hour, and much of the traffic was commercial. In that case the plaintiff offered evidence that the property was worth $29,025 for residential purposes, and $116,100 for business purposes. Two of the corners were devoted to business uses and the third corner was devoted to a school. In that case the court, having considered the volume of traffic, the uses on the other corners and the testimony of various expert witnesses, concluded as follows:

"The fixing of boundary lines, unless arbitrary or capricious, is a matter of legislative judgment which courts will respect. Necessarily, residential property immediately abutting the line will be less valuable than property more remote from the boundary of a commercial zone. (DeBartolo v. Village of Oak Park, 396 Ill 404; Evanston Best & Co. v. Goodman, 369 Ill 207.) But that affords no justification for the constant erosion of such boundaries. 'Where persons have bought property in a certain district under a general zoning ordinance, they have a right to rely upon the rule of law that the classification will not be changed unless the change is required for the public good.' (Wesemann v. Village of LaGrange Park, 407 Ill

456

81.) Indeed, this reliance is the very basis of zoning."

"The evidence discloses a legitimate difference of opinion concerning the reasonableness of the challenged zoning classification in its application to a particular parcel of property. This being so, the legislative judgment of the municipal authorities should be respected. (Cases cited.)"

In the Bolger case the Supreme Court in the face of an estimated volume of traffic as high as 4,000 vehicles per hour sustained the residential zoning of property.

In Standard State Bank v. Village of Oak Lawn, supra, the plaintiff sought to have declared invalid an ordinance zoning property A-residential (single family residences.) The property was located on 103rd Street and bounded on the west by Kilbourn Avenue, and on the east by Kenneth Avenue. Under the zoning ordinance of the Village of Oak Lawn some of the permitted uses for A-residential districts in addition to single family dwelling were churches, schools, libraries and parks. The same uses are permitted under R1 and R2 classifications in the city of Chicago ordinance. In that case the surrounding property was uniformly zoned A-residential. In the case before us the surrounding property is uniformly zoned R–1 and R2 single family residence. In that case 103rd Street carried approximately 11,000 vehicles per day. In the Oak Lawn case the court set forth that the plaintiff had purchased residentially zoned land near the center of an area with no nearby zoning other than single family residential. That is true of the contract purchasers in the instant case.

In the Oak Lawn case the court found that there were single family residences under construction with-

457

in less than a block of the subject tract at the time of the hearings in the trial court. This is likewise true in the instant case. The court there found that it was clearly apparent and virtually conceded by one of plaintiff's witnesses that the predominant characteristic of the neighborhood is its single-family residential development. This is likewise true in the instant case. In the Oak Lawn case there was a difference of opinion as to the effect of the intended use by plaintiff upon surrounding property. Also in the Oak Lawn case, the property would be worth considerably more if plaintiff's proposed use were allowed, and plaintiff would suffer substantial loss unless the zoning ordinance was declared invalid. On page 471 of the Oak Lawn case the court said:

"Plaintiff urges that the findings of the trial court cannot be disturbed unless contrary to the manifest weight of the evidence. We agree that this is the rule. It is, however, clear to us that the evidence, when viewed most favorably to plaintiff, falls far short of overcoming the presumptive validity of the ordinance. At best, it accommodates a legitimate difference of opinion as to the reasonableness of the ordinance, and, under such circumstances, the legislative judgment must prevail."

 In the instant case, the area devoted to apartment uses, which is approximately 1000 feet from the subject property on West Talcott, has no bearing or effect on the subject property. In this case, the best that can be said for the plaintiffs' attack on the reasonableness of the challenged zoning is that there is a difference of opinion, and as was held in Bolger v. Village of Mount Prospect, 10 Ill2d 596, 141 NE2d 22; Fox v. City of Springfield, 10 Ill2d 198, 139 NE2d

732; Mahoney v. City of Chicago, 9 Ill2d 156, 137 NE 2d 37, and Jacobson v. Village of Wilmette, 403 Ill 250, 85 NE2d 753, the legislative judgment of the municipal authorities should be respected where there exists a legitimate difference of opinion.

The presumptive validity of the ordinance has not been overcome in this case. The judgment of the circuit court of Cook County is reversed.

Judgment reversed.

DEMPSEY, P. J. and SCHWARTZ, J., concur.