WILLIAM E. O'CONNOR, Plaintiff-Appellant, *v.* GEORGE D. SULLIVAN, Defendant-Appellee.

(No. 55004;

First District (3rd Division)—June 14, 1973.

Cummings & Wyman, of Chicago, (Stanley M. Cahn, of counsel,) for appellant.

Sullivan and Sullivan, of Chicago, (William J. Harte and Philip Rock, of counsel,) for appellee.

Mr. JUSTICE SCHWARTZ delivered the opinion of the court:

This is a suit in chancery in which plaintiff seeks to recover what he alleges to be an interest in real estate valued at $150,000. His claim is based on services allegedly performed for defendant in connection with the purchase of the real estate. The cause was referred to a master who found that there was no equity in the claim and that, in any event, the plaintiff was barred from asserting such a claim under the Real Estate Brokers and Salesmen Act (Ill. Rev. Stat. 1969, ch. 114½, par. 2b). The chancellor adopted the master's finding and recommendations and entered a decree accordingly. Plaintiff urges that the findings of the master are contrary to the manifest weight of the evidence, and that the chancellor's decree based thereon is erroneous. The facts follow.

Defendant and his family were owners of the Acme Furnace Fitting Company of Chicago. Plaintiff was employed as president and general manager of the company at an annual salary of $15,000. Under plaintiff's management the company suffered a drastic decrease in net worth, and was eventually adjudicated bankrupt on June 17, 1960. As an outgrowth of the bankruptcy, a claim was made by the trustee for $23,000 against plaintiff for expenses plaintiff had incurred for his own personal benefit out of company funds. Defendant paid the $23,000 and received an assignment of the claim the trustee had against the plaintiff. Plaintiff maintained that defendant had approved these expenditures, but this was denied by the defendant. Satisfaction from plaintiff on this claim has never been received by defendant.

Early in 1960, plaintiff learned that the Southmoor Golf Club, located in Palos Park, Illinois, was being offered for sale at a price of $1,200,000.

Plaintiff, an excellent golfer and a commissioner of the Village of Palos Park, was an old friend of Ben T. Stevenson, the owner of the golf club. In March 1960, plaintiff was informed by one William J. Howe that a group headed by Howe was interested in buying the Southmoor Golf Club and retaining plaintiff as its manager. Plaintiff testified that he told Howe he might be able to get a lower price in view of his friendship with Stevenson. Plaintiff maintains that his negotiations with Stevenson resulted in the reduction of the asking price to $1,050,000, with the understanding that plaintiff would be a principal in the purchase. A letter written by Stevenson to plaintiff's attorney, Austin Wyman, at plaintiff's suggestion, was introduced into evidence at the master's hearing. It stated that plaintiff had informed Stevenson that any reduction in his original asking price would become the plaintiff's equity in the purchase, and that on the basis of his long friendship with plaintiff and prior services rendered to him by plaintiff, he would reduce the asking price by $150,000.

Plaintiff informed defendant of the proposed purchase. He testified that he asked defendant, who was an attorney and whose law firm had previously handled a personal injury claim for the plaintiff, to represent his interest in the purchase. Plaintiff further testified that defendant agreed to represent him and remarked that plaintiff had made $150,000 for himself, Defendant, however, denied ever agreeing to represent the plaintiff in the purchase or speculating what the plaintiff might realize from the transaction.

Richard Regan, the Acme Company bookkeeper, testified concerning a letter he had written to plaintiff's attorney. It purported to state that Regan overheard the conversation between defendant and plaintiff during which, it is alleged, defendant agreed to represent plaintiff in the sale, and that defendant suggested plaintiff take steps to protect his $150,000 interest. However, Regan further testified that he wrote the letter under duress from the plaintiff who was his immediate supervisor at Acme; that he never overheard the conversation in question, and that the contents of the letter were dictated to him by the plaintiff.

Patricia Strenk, another Acme employee, testified that she heard plaintiff request Regan to write the letter in question; that Regan wrote the letter himself; and that while plaintiff might have remained in the room while Regan was writing the letter, he did not watch Regan work on the statement, although Regan read it to him when it was completed.

On learning of the proposed sale, defendant became interested in joining with the Howe group as a principal in the purchase. This was suggested at a meeting of the Howe group with plaintiff and defendant; however, the offer to include defendant as a principal was rejected by

the Howe group, and they subsequently withdrew from the proposed transaction.

Defendant then began negotiations with Stevenson for the purchase. On July 1, 1960, a sale was completed whereby Stevenson would accept $500,000 cash and take back a purchase-money mortgage for $550,000. Defendant then organized the Palos Country Club, Inc., and solicited stock subscriptions at 50¢ per share. He also contacted one Arthur Feicht with regard to joining in the purchase, and Feicht agreed to contribute $250,000 to the initial cash requirement of the sale and $50,000 to the initial operating expenses of the golf club. Feicht's interest was held by two corporations in which he was the controlling stockholder, the AJF Corporation and the BHF Corporation, which in turn formed a three-way partnership with the Palos Country Club, Inc., in the ownership and operation of the golf course. Feicht agreed that for his contribution his two corporations would each receive a 23-per cent interest in the property and the Palos Country Club would retain a 54-per cent interest. Richard Murphy, Jr., Feicht's attorney, testified that it was his understanding that the plaintiff would receive the 8-per cent differential between defendant's ownership percentage and Feicht's. Defendant's son, George Sullivan, Jr., testified that Murphy was mistaken as to the purpose of the ownership percentage differential; that Feicht was never told the plaintiff was to have an interest in the property; and that the ownership percentage differential resulted from defendant's belief that since he initiated the purchase he should have the controlling interest in the property.

Plaintiff was retained as the golf club manager at an annual salary of $15,000. In December 1960, he received from defendant a document antedated July 1, 1960, which was entitled "Temporary Certificate of Beneficial Interest." This document stated that subject to the approval of the directors and shareholders, plaintiff was the beneficial owner of 56,800 shares of Palos Country Club, Inc. stock. Plaintiff at this time also signed a stockholder's stock restriction agreement.

There is no evidence that the directors and shareholders ever approved the stock distribution to the plaintiff. Walter Richards, a Palos Country Club director, testified that at an informal directors' meeting in December 1960, the defendant proposed to the board that the plaintiff's stock distribution be approved, and that he vetoed the proposal because of the poor job plaintiff had been doing in managing the golf club. The club had lost over $100,000 during the fall of 1961, under plaintiff's management.

Timothy Keough, a close friend of the plaintiff, testified that he had purchased Palos Country Club stock at plaintiff's suggestion and had

subsequently become a director of the corporation; that he attended every directors' and shareholders' meeting to which he received notice; that he was told by defendant that the plaintiff was also a director of the corporation; and that he never attended a meeting where plaintiff was not present or where plaintiff's management of the club was criticized or the plaintiff's interest in the corporation discussed.

Plaintiff testified that he learned from Timothy Keough that the subscriptions on the corporation's stock had been sold for 50¢ per share, and that being shocked by this information he confronted the defendant who informed him that the value was indeed only 50¢ per share and that plaintiff's stock interest was worth only $28,000. Plaintiff further testified that a few days later he again met with defendant; that defendant offered him $1.00 per share for his stock; and that plaintiff advised him he would consider the offer. Defendant testified that he never made plaintiff an offer of $1.00 per share for his stock because plaintiff never had any stock to begin with. Plaintiff again met with defendant in the latter's office and demanded $150,000 or evidence of his interest in the golf club for that amount. Defendant told plaintiff that he had no interest in the property and deserved none in light of his record in managing the Acme Company and the golf club. Plaintiff then filed this suit.

Subsequently, plaintiff instituted proceedings which placed the golf club in receivership. Further, he enlisted creditors to file an involuntary petition in bankruptcy against the golf club. The report of the master found it was unbelievable that the plaintiff was to receive $150,000 for the services he rendered, regardless of what interest the defendant or his associates would obtain if the purchase from Stevenson were consummated. The report further found it incredible that a person who honestly believed he had a legitimate claim for $150,000 interest in the golf club or against the defendant would become instrumental in filing an involuntary petition in bankruptcy against the golf club.

The master found in his report that the acts performed by the plaintiff in connection with the transaction in question were those of a real estate broker; and that regardless of whether plaintiff did or did not literally hold himself out to be a broker, his activities were such as to bring him within the prohibitions of Ill. Rev. Stat. 1969, ch. 114½, par. 2b, which bars recovery of any compensation for brokers' services performed by one not duly certified as such by the State. We proceed to a consideration of plaintiff's points upon appeal.

 Here, the master heard the evidence and submitted his findings and recommendations to the trial court which adopted the master's report and entered a decree accordingly. Plaintiff cites *Babray v. Carlino*,

2 Ill.App.3d 241, in support of his contention that in such cases a reviewing court may delve into the evidence presented to the master and decide anew where the preponderance lies. While there exists authority, such as the *Babray* case, for that position, the great weight of the authority is to the contrary. (*Suwalski v. Suwalski*, 40 Ill.2d 492; *Horan v. Blowitz*, 13 Ill.2d 126; *Kioutas v. City of Chicago*, 59 Ill.App.2d 441.) In cases where the trial court has rejected the findings and recommendations of the master, a reviewing court can examine the evidence from an unrestricted perspective. Where the trial court has adopted the master's findings and recommendations, the standard of review on appeal is the same as where the trial court has conducted the hearing and heard the evidence itself; that is, whether the manifest weight of the evidence is contrary to the decree. *Strilky v. Levy*, 33 Ill.App.2d 91.

■■ The evidence presented by the parties in the instant case conflicts on every material contention concerning the transaction in question. The credibility of the witnesses is the decisive factor in the outcome of this case, and the master who heard and saw the witnesses was in the best position to evaluate their credibility. It is our conclusion that the evidence supports the master's report and the decree of the chancellor sustaining that report. In view of this, it is not necessary that we pass upon the alternative finding of the master that plaintiff's claim is barred by State statute. The judgment is affirmed.

Judgment affirmed.

McGLOON and LEIGHTON, JJ., concur.