NATIONAL BOULEVARD BANK OF CHICAGO, Trustee, *et al.*, Plaintiffs-Appellees, *v.* THE VILLAGE OF SCHAUMBURG, Defendant-Appellant.

First District (4th Division)    No. 77-1909

Opinion filed September 6, 1979.

Jack M. Siegel, of Chicago, for appellant.

Theodore J. Novak and James R. Mikes, both of Chicago (Rudnick & Wolfe, of counsel), for appellees.

Mr. JUSTICE LINN delivered the opinion of the court:

Defendant, Village of Schaumburg (Village), appeals from a judgment of the circuit court of Cook County declaring the R-1, single-family, zoning classification of plaintiff's property invalid insofar as it prohibits a high density residential development proposed by plaintiff, Eugene Matanky. Plaintiff Matanky, the sole beneficial owner of the property held in trust by plaintiff National Boulevard Bank of Chicago, initiated this declaratory judgment action after the Village Board denied his request for a rezoning of the subject property to permit construction of either the initial or alternate development he proposed.

The circuit court found that plaintiff had overcome the presumption of validity of the Village's zoning ordinance as applied to the subject property, and the court approved as reasonable the combined multi-family and single-family uses contained in plaintiff's alternate plan.

We reverse the judgment of the circuit court.

The subject property is a vacant 26.5-acre rectangular parcel, approximately 860 feet long at its northern and southern boundaries and 1350 feet deep.* It is located immediately south of Schaumburg Road and approximately 800 feet west of Roselle Road in the Village of Schaumburg. Abutting the property on the south and west sides are single-family residential areas developed under an O-R, office-research, classification which permits single-family development as a special use. Called the Woods and Timbercrest subdivisions, these residential areas contain single-family residences with values from $60,000 to in excess of $100,000. Across Schaumburg Road to the north, Friendship Village, a church-sponsored housing project for the elderly, has been developed under B-2, planned unit development (PUD) zoning. The buildings of Friendship Village are set back 700 feet from Schaumburg Road and are partially screened by a grove of trees. Also north of the subject property on Schaumburg Road, are areas zoned R-6 and R-4, single-family, that are partially improved with single-family homes.

---

* See attached map.

77-1909

Abutting the subject property to the east is an area zoned T-1, transitional district. This property contains the Town Square Shopping Center, accessible from Roselle Road, and substantial vacant land. The Town Square Shopping Center contains a number of small shops and an animal shelter maintained by the homeowners' association of the Woods subdivision. Also directly west of the plaintiff's property is a small area zoned B-2, containing a gasoline station.

South of the shopping center, in an area zoned T-1, are the Town Square Apartments which are being converted to condominium use by plaintiff. The Town Square Apartments do not abut and are separated from the subject property by a school and park. There are other multifamily developments in the general area of the subject property. One such development, Laurelwood, provided a model for plaintiff's alternate proposal of combined multifamily and single-family uses.

On November 25, 1975, the subject property was formally annexed by the Village and, in accordance with the Village zoning ordinance, automatically received an R-1 classification, the highest and most restrictive classification permitted. Apparently, a previous attempt by the Village to annex the property in 1971, had been rendered ineffective by its failure to properly record the annexation plat and ordinance. However, between 1972 and 1975, the property had been depicted on the Village zoning map as bearing a B-2, business-general retail, classification subject to a special use as a PUD. The 1971 ordinance permitting the special use provided for the construction of 460 apartment units to be located in three and five-story buildings, covering 11 percent of the subject property; however, construction on this project did not commence within the two-year period required by the ordinance.

Plaintiff obtained an option to purchase the subject property for $500,000 in September 1974. Before exercising his option and unaware that the property had not been properly annexed, plaintiff discussed with the Village mayor his plan to modify the PUD permitted under the special use ordinance. Plaintiff was advised that the Village Development Committee would have to approve any modification in the special use. Plaintiff proceeded to exercise his option to purchase the property in April 1975, and began preparing a proposal for improving the site. Plaintiff met with and discussed his plans with the development committee and was thereafter referred to the Village Zoning Board of Appeals to seek an amendment to the special use ordinance. Sometime after applying to the Zoning Board of Appeals in March 1976, plaintiff learned that the property had been rezoned R-1 by virtue of the Village's annexation of the property in November 1975. Plaintiff then sought rezoning.

The present R-1 zoning of the subject property permits one single-family residence on every 2½ acres of land. The Village asserts that the R-1

classification is a holding zone and does not claim that it is the appropriate classification for the property. Plaintiff seeks to develop the property under a B-2 PUD classification, with R-6 cluster zoning.

Plaintiff initially proposed to build 66 three-story, six-unit buildings on the property. The cedar and masonry buildings would be dispersed in clusters leaving a 4-acre wooded area in the northwest corner of the property. The density of this proposal is 14.9 units per acre. At the request of the Village, plaintiff submitted a revised plan which included 56 six-flat buildings and 20 single-family lots bordering the west and south perimeters of the property that adjoin the existing single-family subdivisions. The overall density of this proposal is 13.4 units per acre.

In other respects the initial and alternate plans are similar. Plaintiff planned to sell each six-flat module for approximately $150,000 to individuals for their own use and rental. The common areas, including recreational facilities, would be owned and maintained by a condominium association. Access to the multifamily units would be provided from Schaumburg Road, and extensive landscaping and berming would be used to buffer the development from existing uses in the area.

The witnesses for both plaintiff and the Village agreed that the present R-1 zoning of the subject property is not a reasonable classification. Plaintiff's experts testified that either the initial or alternate plan submitted by plaintiff represented the highest and best use of the subject property. Plaintiff's planning and zoning expert testified that the proposed clustered six-flats would preserve the wooded character of the property, would be in keeping with the character and development of the area, and would provide a good transition between the Woods and Timbercrest subdivisions and the commercial uses in the T-1 zone. He did not advise placing single-family homes next to the Town Square Shopping Center, but admitted that the property could physically be adapted to either single-family or townhouse development and that these uses would also be consistent with the surrounding uses. He stated that the proposed development would not depreciate the surrounding single-family homes, noting that the Woods and Timbercrest subdivisions, which were completed in 1975, had been developed during a period of time when the subject property was shown on the Village zoning map as a B-2 PUD.

Plaintiff's architect described both the initial and alternate site plans proposed by plaintiff. He testified that the site could feasibly be developed as single-family but it would not provide plaintiff as high a return on his investment. Plaintiff's real estate expert estimated the fair market value of the property as currently zoned to be $250,000; if developed as single-family similar to the abutting subdivision, to be

$665,000; if developed under plaintiff's alternate plan, to be $1,235,000; and under the initial proposal to be $1,267,000. It was his opinion that the proposed uses would not depreciate or impede the normal increase in the values of surrounding property but that if single-family homes were located next to the shopping center they would encounter market resistance. He concluded that there is a need for multifamily as well as single-family and townhouse uses in the area and that the subject property is physically adaptable to any of these uses.

Plaintiff's traffic engineer testified that present conditions on Schaumburg Road were inadequate to handle the estimated 2,800 trips a day that would be generated by plaintiff's proposed development. However, an existing county proposal to widen Schaumburg Road would alleviate this potential traffic problem. Another engineer testifying on plaintiff's behalf stated that the available utilities are adequate to serve either the proposed development, single-family, or townhouse construction. Sanitary sewer connection could be made into the adjacent shopping center facilities, but plaintiff had not acquired a written easement for that purpose.

The Village planning and zoning consultant testified that plaintiff's high-density proposed use would have an adverse effect on the adjacent single-family residences. Because the subject property lies lower than the surrounding property, the six-flat buildings would be visible from the nearby homes. Although plaintiff's alternate plan was feasible, it created an improper transition because dissimilar uses faced each other. It was the planner's opinion that a moderate density development was the highest and best use of the property. He suggested building five or six units per acre, with two rows of single-family homes providing a buffer between the development and the existing single-family homes. Townhouses of low density should comprise the balance of the development with the transition in uses taking place at the rear property line. The witness prepared a site plan depicting his suggested use of the property and admitted that his plan would also require variations from the Village zoning ordinance.

The planner further testified that the property was suitable for single-family development if properly screened from the shopping center along the eastern boundary and could accommodate 80 homes. There is a demand for single-family homes and townhouses in the Village. The witness believed that the subdivisions to the south and west had a greater influence on the character of the property than the Friendship Village, Town Square Shopping Center and Apartments, and other multifamily developments in the general vicinity of the property.

The director of the Village Planning Department testified that a comprehensive land use plan was prepared for the Village in 1962, but

was never formally adopted. He assumed that there were instances where the Village had not followed the comprehensive plan. Under the comprehensive plan the subject property was designated for single-family development. The director had met with plaintiff during the early stages and had expressed favorable opinions of plaintiff's proposal, but, after considering more complete information, now felt that the property was unsuitable for development under either plan. It was his opinion that the highest and best use of the property was for single-family development which could be successfully accomplished with proper screening from the shopping center. He believed that plaintiff's plan was incompatible with the adjacent subdivisions, that the proposed use would create traffic problems, and that high-density developments in the Village should be located near Woodfield Mall, a major shopping center. He conceded that there were areas in the Village where single-family adjoined multifamily and had advised plaintiff of such developments, including the Laurelwood development.

The Village engineer estimated that the plaintiff's planned development would generate 2,400 to 2,500 automobile trips per day, while the low-density use suggested by the Village planning expert would generate 1,000 trips. The engineer objected to the internal traffic circulation plan within the proposed development. He noted that plaintiff would have to obtain approval from the county to drain storm water runoff into the county ditch along Schaumburg Road. It was his opinion that the only existing sanitary sewer that could accommodate the development served the shopping center and that plaintiff would also have to obtain an easement to hook into the facility.

A real estate appraiser called by the Village was of the opinion that the highest and best use of the subject property was for single-family homes on 10,000 square foot lots. Approximately 80 single-family homes could be built on the property in this manner. He estimated the value of the property for single-family use to be $720,000, while the fair market value of the property for plaintiff's proposed use would be $1,000,000. The witness stated that the proposed development would have a depreciatory effect on the single-family subdivisions to the south and west; the amount of depreciation would depend on the screening from the development. Under the alternate proposal the depreciation would be five to six percent for the homes nearest the perimeter and diminish with distance from the six-flat development. He admitted that the property was physically suitable for plaintiff's plan.

Four homeowners from the Woods subdivision objected to plaintiff's proposal. It was their opinion that the essentially multifamily development would have an adverse impact on their property values, would not be aesthetically appealing, and would increase traffic congestion.

Some felt that potential absentee ownership of the six-flats and the generally less expensive construction to be utilized in the multifamily buildings would have an undesirable effect on their homes. Several of the homeowners, including two who had checked the zoning before purchasing their homes, stated that they would not have purchased in the area if the proposed development had then existed.

OPINION

■■ Preliminarily, plaintiff contends that the Village is estopped from applying a zoning classification other than the B-2 PUD designation ostensibly adopted in 1971, when the Village first attempted to annex the subject property. We can find no basis for an estoppel. The PUD permitted as a special use under the 1971 ordinance expired by its own terms when construction on the project failed to begin within two years of the adoption of the ordinance. (See *Goffinet v. County of Christian* (1976), 65 Ill. 2d 40, 357 N.E.2d 442.) More significantly, the property was rezoned in 1975, several months before plaintiff applied for rezoning to permit the proposed use, when the Village formally annexed the property. As allowed by statute, the property takes the highest and most restrictive use allowed under the Village zoning ordinance. (See Ill. Rev. Stat. 1975, ch. 24, par. 7—1—47.) In the complaint plaintiff recognized this by alleging that the subject property is subject to an R-1 zoning classification.

■■ Because of the rezoning of the property upon annexation in 1975, it would be unfair in this case to presume that plaintiff purchased the property with knowledge of the present zoning. What is evident, however, is that plaintiff, a seasoned developer, knew that his development plans required Village approval, even under the 1971 B-2 PUD classification. Plaintiff claims that the actions of the Village officials in encouraging his efforts to develop an acceptable proposal somehow inured to his benefit. We disagree. The language in *Exchange National Bank v. Village of Hoffman Estates* (1977), 48 Ill. App. 3d 475, 481, 363 N.E.2d 69, 74, is appropriate here:

"We view the actions of defendant's officials as proper and as affording plaintiffs a reasonable opportunity to present and to discuss their plans. Although the officials were encouraging, they did not indicate that the property would be rezoned to accommodate plaintiffs' plans. No formal action was taken by the Plan Commission or the Board of Trustees. Defendant's president warned of possible problems with roadways running through South Barrington. Defendant did not act positively or affirmatively in any manner which would induce plaintiffs to make expensive

permanent improvements, thereby possibly invoking the doctrine of estoppel. The proposed plans were merely listened to, studied, and eventually rejected."

Admittedly, the R-1 designation applicable to the subject property, which permits only one single-family home on each 2½ acre parcel, is an inappropriate classification for the development of the property. We recognize that the Village's retention of the R-1 classification as a holding zone is a technique accepted as a legitimate means of controlling growth in undeveloped areas. (See *People ex rel. Trebat v. City of Park Ridge* (1969), 110 Ill. App. 2d 404, 249 N.E.2d 681.) However, the Village has indicated its willingness to rezone the property for a less intensive use than that proposed by plaintiff. The Village's expert witnesses stated that the property could best be developed as R-6, single-family, or a combination of townhouses and single-family residences of low density.

■■ In the usual zoning challenge, the plaintiff property owner is required to prove by clear and convincing evidence that the existing classification is invalid and that the use proposed is reasonable. (*First National Bank v. Village of Morton Grove* (1973), 12 Ill. App. 3d 589, 299 N.E.2d 570.) Where, as here, the municipality admits the inappropriateness of the existing classification, the plaintiff must still show by clear and convincing evidence the invalidity of the ordinance insofar as it prohibits the use proposed. Stated differently, the question to be resolved by the court is whether the municipality's denial of rezoning to permit the proposed development is reasonably related to the health, safety, morals and welfare of the community. (See *Schultz v. Village of Lisle* (1972), 53 Ill. 2d 39, 289 N.E.2d 614; *Littlestone Co. v. County of Cook* (1974), 19 Ill. App. 3d 222, 311 N.E.2d 268, *cert. denied* (1975), 420 U.S. 929, 43 L. Ed. 2d 401, 95 S. Ct. 430; *Schmidt v. City of Darien* (1975), 31 Ill. App. 3d 617, 333 N.E.2d 678.) The determination of this question requires a balancing of the considerations enumerated in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65.

■■ Of paramount importance is the nature of the existing uses and zoning of nearby property. (*Littlestone Co. v. County of Cook* (1974), 19 Ill. App. 3d 222, 311 N.E.2d 268, *cert. denied* (1975), 420 U.S. 929, 43 L. Ed. 2d 401, 95 S. Ct. 430.) Plaintiff urges that the property is characterized primarily by the adjacent T-1 zone containing the Town Square Shopping Center and Apartments. The Town Square Apartments are separated from the property by a school and park area. The Town Square Shopping Center is a neighborhood type of facility rather than a major commercial shopping area. It is sufficiently removed from the property line of plaintiff's property to restrict its influence on the character of the subject property. The T-1 zone also contains substantial vacant land abutting the

subject property. We find the potential for additional commercial development in the T-1 zone of less consequence than the established uses in the area and their present impact on the property.

The gasoline station, on a site zoned B-2 facing Schaumburg Road, is perhaps the most significant commercial use with relation to the property; however, its impact is offset by the Woods and Timbercrest subdivisions which abut the property on two entire sides and which back up completely to the property line. Friendship Village has comparatively little impact on the property because of the 700-foot distance that the buildings are set back from Schaumburg Road and the wooded area that screens the buildings from Schaumburg Road and plaintiff's land.

It is evident from the aerial photographs and maps that the substantial single-family homes in the adjacent subdivisions influence the character of the property significantly. The homes in the Woods subdivision are valued from $100,000 to $125,000 and in the Timbercrest subdivision from $60,000 to $80,000. Other multifamily developments stressed by plaintiff are separated from his property by as much as one mile and are not shown on the maps or photographs of the property. In our opinion the single-family subdivisions dominate the character of the property.

It is conceded that the property is worth substantially more if the high-density use proposed by plaintiff is allowed. The real estate expert called by plaintiff indicated that the property is worth $250,000 as currently zoned, $665,000 if zoned for less restrictive single-family use, and $1,235,000 if developed under plaintiff's alternate plan. The Village's experts stated that the value of the property for single-family use is $720,000 and $1,000,000 if the requested rezoning is allowed.

The existence of a diminution in value does not necessarily require invalidation of the zoning ordinance. (See *Kioutas v. City of Chicago* (1965), 59 Ill. App. 2d 441, 208 N.E.2d 587.) The increase in density which is characteristic of multifamily developments typically increases the value of the property. This situation is common to virtually every zoning case where a more intensive use is sought. (*Littlestone Co. v. County of Cook* (1974), 19 Ill. App. 3d 222, 311 N.E.2d 268, *cert. denied* (1975), 420 U.S. 929, 43 L. Ed. 2d 401, 95 S. Ct. 430.) It is not the mere loss in value that is significant, but the extent to which that diminution is required by the public welfare. *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65; *La Grange State Bank v. County of Cook* (1979), 75 Ill. 2d 301, 388 N.E.2d 388.

■■ A municipality may reasonably restrict increased population density as necessary to protect the public welfare. (*Lapkus Builders, Inc. v. City of Chicago* (1964), 30 Ill. 2d 304, 196 N.E.2d 682; *La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 312 N.E.2d 625.) "Such

regulations prevent congestion of population, secure quiet residence districts, expedite local transportation and facilitate the suppression of disorder, the extinguishment of fires and the enforcement of traffic and sanitary regulations, all of which have a direct bearing upon, and substantial relation to, the public health, safety, morals or general welfare of the community." *Littlestone Co. v. County of Cook* (1974), 19 Ill. App. 3d 222, 237, 311 N.E.2d 268, 279, *cert. denied* (1975), 402 U.S. 929, 43 L. Ed. 2d 401, 95 S. Ct. 430.

From an aesthetic point of view, the overall 13.4 density of plaintiff's alternate plan is inconsistent with the adjacent single-family homes built on 8,000-foot lots. The alternate site plan includes 56 six-flat buildings, 20 single-family homes and 692 parking spaces within 40 feet of the existing single-family subdivisions. There is conflicting evidence as to whether the proposed use would have a depreciatory impact on the homes in the Woods and Timbercrest subdivisions. The Village's real estate expert was of the opinion that the proposed development would have negative impact on the homes in the subdivisions. He estimated the extent of the depreciation at five to six percent with regard to the homes on the boundaries of the subject property, with diminishing effect to homes further away. The Village's city planner testified that the physical appearance of the proposed structures was not compatible with the single-family homes. He agreed with witnesses for both sides that extensive berming and fencing would be necessary to screen the single-family homes from the six-flats.

Plaintiff's planning and real estate experts stated that the proposed development would not have an adverse impact on surrounding properties. They reasoned that since the subdivisions were partially developed during a period when the subject property was shown on the Village map as zoned B-2 PUD, the construction of the proposed development under similar zoning should not be viewed as having a negative impact on those subdivisions. However the special use allowed under the 1971 ordinance, which provided for considerably less ground cover than under plaintiff's plan, expired when the condition of commencement of construction within two years was not met. In the interim period, substantial construction took place on the adjacent subdivisions, especially the Woods development, which considerably stabilized the single-family character of the area.

■■ Plaintiff argues that the proximity of Schaumburg Road and the Town Square Shopping Center makes the property unsuitable for single-family development. The adjacency of heavily traveled roads does not alone undermine the nature of an otherwise single-family residential area. (*La Salle National Bank v. Village of Western Springs* (1964), 30 Ill. 2d 340, 196 N.E.2d 680.) There is evidence that the property is suitable for

single-family construction under a less intensive classification. A need for single-family residences exists in the area. Although plaintiff does not have the burden of showing that each intervening zoning classification is unreasonable (*First National Bank of Des Plaines v. County of Cook* (1977), 46 Ill. App. 3d 677, 360 N.D.2d 1377), the fact that the property is suitable for single-family development is significant in determining whether plaintiff's proposal is reasonable under the prevailing circumstances.

■■ Although the length of time that the property has been vacant is also a factor to consider (*Western National Bank v. Village of Downers Grove* (1970), 122 Ill. App. 2d 107, 257 N.E.2d 803), here it is of little import. The present R-1 classification has been in effect only since plaintiff purchased the property. The Woods subdivision was completed in 1975 and there is no evidence that plaintiff has attempted to utilize his property for similar single-family development. See *Georgen v. Village of Mount Prospect* (1978), 65 Ill. App. 3d 512, 382 N.E.2d 523.

■■ After careful review of the record, we find that the evidence in this case creates, at best, a legitimate difference of opinion as to the reasonableness of prohibiting the proposed use. Thus, the trial court's determination that plaintiff sustained the heavy burden of proving the Village acted unreasonably in denying plaintiff's request for rezoning is against the manifest weight of the evidence. (See *Littlestone Co. v. County of Cook* (1974), 19 Ill. App. 3d 222, 311 N.E.2d 268, *cert. denied* (1975), 402 U.S. 929, 43 L. Ed. 2d 401, 95 S. Ct. 430.) We conclude that plaintiff has failed to overcome the presumptive validity of the legislative determination. Judgment reversed.

Reversed.

JIGANTI, P. J., and JOHNSON, J., concur.