LA SALLE NATIONAL BANK & TRUST COMPANY, Trustee, Plaintiff-Appellee, *v.* THE COUNTY OF COOK, Defendant.—(THE VILLAGE OF ARLINGTON HEIGHTS, Intervening Defendant-Appellant.)

First District (2nd Division)   No. 79-14

Opinion filed March 11, 1980.

Jack M. Siegel, of Chicago, for appellant.

Jerome S. Schain, Thomas R. Burney, Robert C. Kenny, and Peter A. Shamburek, all of Chicago, for appellee.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Following the denial of its application for rezoning, plaintiff, La Salle National Bank & Trust Company, as trustee, brought this action against the county of Cook, seeking declaratory and injunctive relief from the county's zoning ordinance as applied to the property that is the subject of the land trust. The village of Arlington Heights, which borders the subject property, sought and was permitted, unopposed, to intervene as a defendant. After a bench trial in the circuit court of Cook County, the court granted plaintiff the relief requested. Only the intervenor-defendant village has appealed.

Plaintiff, as trustee under a land trust, is the legal owner of the subject property, in which Kenneth Tucker and Roy Gottlieb each have a 50% beneficial interest. The property is a 56.68-acre vacant tract of land located in an unincorporated area of Wheeling Township in the County of Cook. The village of Arlington Heights adjoins the property on its east and south borders and the major part of its west border. The property is rectangular in shape, and is traversed by Buffalo Creek on the south and east sides of the property. Bounded on the west by Wilke Road and on the north by Nichols Road, the property lies approximately 2000 feet northeast of the interchange of Dundee Road and Illinois Route 53.

The subject property is zoned R-4 under the county's zoning ordinance, which contemplates single-family residences on 20,000-square-foot lots. Plaintiff has proposed to build a residential planned unit development (PUD) in conformity with the R-7 (PUD) standards of Cook County. The proposed PUD consists of 576 dwelling units in 96 three-story brick buildings, 6 units in each building. A typical building will contain five two-bedroom units and one three-bedroom unit. (The judgment order of the trial court provided for not more than 1248 bedrooms with a maximum of 96 three-bedroom units and with 480 one-or-two-bedroom units.)

At present, only 20 to 25 acres of the property are buildable. Plaintiff

has proposed relocating Buffalo Creek farther to the south and east, resulting in 36 acres of buildable property and 20 acres of open space usable to the residents of the project, including bicycle and walking paths, tennis courts, and a barbecue pit. The proposed development will contain its own internal system of streets, while ingress and egress to the site will be provided through two drives at Wilke Road to the west of the site and one drive at Nichols Road to the north. Two parking spaces, apparently either clustered around the buildings or located on the development's streets, will be available for each of the 576 residences. The Ferndale Heights Utility Company will service the site with sewer and water connections. Police protection will be the responsibility of the Cook County sheriff's police, while primary fire protection will come from the Long Grove rural fire protection district.

The subject property is located in the northeast quadrant of the interchange of Illinois Route 53 and Dundee Road. Land uses and zoning in that quadrant are diverse. Immediately to the east of the site, the land is zoned P-1 Public Land District in the village of Arlington Heights. The land was used as a landfill until 1973, and Arlington Heights has plans to develop it as a park. The property immediately to the south of the subject site in Arlington Heights is zoned M-1A Industrial Office and Research under the Arlington Heights zoning ordinance. That parcel, which borders on Dundee Road and Route 53, is improved with a Honeywell plant. Immediately west of the subject property, between Wilke Road and Route 53, is a vacant tract known as the Muss property, which is also zoned M-1A in Arlington Heights. Immediately north of the Muss property and north and northwest of the subject property is an R-5 PUD located in unincorporated Cook County (the Tiburon PUD). As approved, the major portion of that parcel is being developed with single-family residences on 8500-square-foot lots; its northernmost section, which borders on the extension of Lake-Cook Road, is zoned commercial. A smaller parcel north of part of the Tiburon PUD but south of Lake-Cook Road is zoned R-4 single-family under the County ordinance and is vacant.

Still within the northeast quadrant, to the west of the Tiburon PUD and bordering on the right-of-way of Route 53 are two incipient developments on land zoned R-8 multiple-family in Cook County, both of which were approved through declaratory judgment actions. Also west of Tiburon and bordering on the Route 53 right-of-way is a 12-acre vacant parcel known as the Bestmann property, which the record reveals was rezoned as R-7 PUD by Cook County, over Arlington Heights' objection, just prior to the trial of this cause. To the northeast of the subject site is a large tract in Arlington Heights, bounded by Lake-Cook Road on the north, Arlington Heights Road on the east, and Schaeffer Road on the

west. This parcel is being developed by the Kennedy Brothers under recent rezoning by Arlington Heights to an R-3 designation, which permits single-family residences on 8750-square-foot lots.

To the west of Route 53, in the northwest and southwest quadrants of the Dundee Road/Route 53 interchange, much of the land is zoned for and has been developed with varying intensities of multiple-family development under the Cook County zoning ordinance, including R-7 and R-8 PUDs and conventional apartment developments. In the southeast quadrant, in Arlington Heights, land bordering the south side of Dundee Road is zoned commercial, while land directly south of there is zoned light industrial under the Arlington Heights M-1A zoning classification. Much of that land is vacant, but one parcel bordering on Route 53 has been developed for light industrial use by Shure Brothers, Inc.

The county zoning board of appeals recommended denial of plaintiff's rezoning request, and the county board denied the rezoning, whereupon plaintiff filed the instant action. The following pertinent testimony was adduced at trial.

Roy Gottlieb, president of Kenroy, Inc., a real estate development firm, testified as a beneficiary of the land trust in interest. Gottlieb has been in the business for 22 years and participated in the development of residential, commercial, industrial, and office uses, including the Honeywell and Shure Brothers parcels south of the subject property. The land trust purchased the land as part of a 150-acre parcel in 1969. He was aware the property was zoned for single-family residences on 20,000-square-foot lots at the time of acquisition. Gottlieb testified generally that he attempted to market the property "as is" through brokers and by contacting potential purchasers directly. Between 1975 and 1977, Kenroy also distributed 2000 brochures advertising the property as part of a larger parcel for industrial purposes. He thought the property was not suitable for manufacturing or light industrial or office use, first, because of its location. The property does not abut a major highway or freeway, unlike the Honeywell property, and large industrial users prefer prominent locations on major roads. The only feasible industrial use would be smaller sites of one to three acres. The location also affected access to the property as industrial traffic would be required to go through residential areas. The existence of flood plain made the property less suitable for industrial uses because even after creek relocation, 20 acres of open space unusable by industry would remain. Gottlieb further testified to the lack of need and demand for industrial property in the area. No other industrial development had taken place in the northeast quadrant in the 10 years since construction of the Honeywell plant, and much land zoned industrial remained vacant south of Dundee Road in the southeast

quadrant, including 30 acres Gottlieb owned. He also stated generally that he did not think the subject property would be suitable for single-family residences.

On cross-examination, Gottlieb testified that the property advertised in the brochures was a 525-acre parcel, 158 acres of which were not zoned for industrial use, but for single-family. In 1969, there was a mortgage of $1,075,000 on the 158-acre tract. In 1978, there was a contract price of $1,700,000 for a 74-acre parcel, which is being developed for single-family housing (the Tiburon R-5 PUD). If the subject property were developed as proposed, the open space would be maintained by Gottlieb's company, by a condominium association or possibly by a park district. The individual buildings on the site might be sold to individual owners, in which case a property owners' association would be formed to apportion maintenance responsibilities, as in another development in which Gottlieb participated. No one to whom Gottlieb mentioned the property ever intended to build houses on half-acre lots in that area. Single-family housing is being built on 8500-10,000-square-foot lots in the Tiburon PUD, contiguous to the subject property, but Gottlieb was not sure whether he had ever offered the subject property specifically for that use.

Wilke Road, which runs along the west boundary of the property, now ends at Nichols Road. It contains 24 feet of pavement in a 100-foot right-of-way. Gottlieb knew of no plans to widen the pavement. From Nichols Road north, however, the builder of the Tiburon PUD intended to extend Wilke Road to the extension of the Lake-Cook Road. Gottlieb reiterated that the property was not suitable for a major industrial user because it is not visible on main roads. Smaller industrial users usually locate farther back from the freeway, but they would not be in a position to maintain the open flood plain area, he said. In his opinion, multiple-family development was in more demand than single-family or industrial and would serve as a transition between the single-family and industrial uses in the area. He conceded major industrial users might want to maintain an open landscaped area.

Richard Stern, an urban planner, testified on behalf of plaintiff. In the past, he had been employed by both the village of Arlington Heights and the county of Cook, and had participated in preparing their comprehensive land use plans as well as the county zoning ordinance. Stern testified that land uses decrease in intensity in concentric zones as one moves away from the interchange of a limited access expressway and a major arterial highway such as the Route 53/Dundee Road interchange. Within the range of influence of such an intersection, land should be intensively zoned and developed, either for PUD, multiple-family, industrial, or commercial purposes. The subject property is one of the least intensively zoned parcels in the four quadrants of the interchange,

but it is within the range of influence of the interchange and therefore should be developed for comparably intensive purposes as the land in the other quadrants.

Stern's definition of highest and best use was the use which can be incorporated into the scheme of community development without adversely affecting Cook County and which affords a fair economic return to the owner or developer of the property. The highest and best use of the subject property, according to Stern, was multiple-family use at the density proposed with open space along Buffalo Creek. The most significant factors he considered in arriving at that opinion included the surrounding land uses and zoning; local, county, and regional development trends; the need for and marketability of the proposed use; the economic return to affected government units from the proposed use; the location, size, shape, and topography of the subject property; and the urban infrastructure necessary to serve the proposed use.

With regard to land use, Stern emphasized the predominance of multiple-family development north of Dundee Road on both sides of Route 53 and its extended right-of-way. He considered the location of the subject site between the single-family construction to the north and the Honeywell facility to the south, and adjacent to the Arlington Heights landfill. The development would serve as a transitional land use, intervening in intensity between the single-family and industrial uses. He testified to the recent rezonings in that area of unincorporated Cook County, including the rezoning of the Tiburon property from R-4 to R-5 PUD; the very recent rezoning of the Bestmann property, from R-4 to R-7 PUD; the 1975 rezoning of the property being developed as Edinborough Apartments and Arlington Country Apartments, along the right-of-way of Route 53, to an R-8 special use; and of single-family and multiple-family uses on a golf course to exclusively single-family. He also considered the Muss property west and south of the subject site, within Arlington Heights, which is zoned M-1A and is vacant. Finally, he considered the uses in the other quadrants of the interchange.

With regard to local, county, and regional development trends, Stern considered the comprehensive plans of Cook County and Arlington Heights, both adopted in 1976. He was the principal author of the text of the county plan. In Stern's opinion, the proposed development conformed to both the map and text portions of the county plan. He believed it also conformed to the text of Arlington Heights' comprehensive plan, although that plan's land use map designates the property as suitable partially for manufacturing, research and development and partially for open space. His belief was founded on two statements in the text of the plan, which he thought made the plan ambiguous: first, that conditions would favor residential growth through low-density developments of 6 to 8 units per acre and moderate density

multiple-family developments of 14 to 20 units per acre; and second, that substantial housing developments were anticipated in the Buffalo Creek area. Stern's opinion was also influenced by the village apartment policy, which states that additional apartments could serve a limited function in Arlington Heights by acting as a buffer between single-family residential districts and commercial or manufacturing districts, thoroughfares and railroads and other areas or facilities that conflict with single-family development, although not if single-family development could take place without a buffer. Furthermore, a multiple-family development would be consistent with the village's policy of a residential use ratio of 66% single-family to 33% multiple-family overall. He thought the text of the Arlington Heights plan conflicted with the plan's map because the only parcels in the Buffalo Creek area depicted as multiple-family on the map (the Kennedy Brothers site) had been rezoned to single-family.

Stern also considered the tax return to affected governmental units from the proposed use in formulating his opinion. He prepared a revenue generation analysis which projected a total of $307,085 in real estate tax revenue. The Long Grove rural fire protection district would receive $8976 annually, while the county would receive $18,686 annually as a result of the development.

As to the location, size, shape, and topography of the site, Stern reiterated the property's location near the interchange and between the single-family and industrial uses. The topography of the site was generally rolling, dropping 30 feet from west to east, which he believed made it difficult to develop for any use but residential. He believed the economic burden of relocating the creek could only be borne by a multiple-family development. For these reasons, Stern considered the existing R-4 zoning unreasonable. In addition, there had been no development of property zoned R-4 in the area in the last four years. Single-family development on lots smaller than 20,000 square feet would be undesirable for the same reasons. As for industrial use, he felt the cost of creek relocation would be prohibitive and the rolling land would be unsuitable. The marketability of the site for industrial purposes would be impaired because it is across from single-family residences. There was much vacant land zoned industrial in the area which had been on the market for years and had not been developed. Finally, in Stern's opinion the proposed R-7 use would be most suitable and would not adversely affect surrounding property.

On cross-examination, Stern testified that he did not know what the economic return to the developer on the property would be, or what the profitability of any use would be, outside of his conversations with Gottlieb. He was asked the effect of the following provision in the county's comprehensive plan, which he drafted:

"a. UNINCORPORATED LAND SURROUNDED BY ONE MUNICIPALITY

When a parcel of unincorporated land is completely surrounded by one (1) municipality, and that municipality has prepared and adopted a comprehensive plan containing a land use element dealing with the property in question subsequent to January 1, 1970, that municipality's plan shall apply to the property. In such case where a municipal plan was prepared prior to 1970, or no plan exists, a new plan shall be prepared by the municipality within three (3) years of the date of adoption of the Comprehensive Text Amendment to the Cook County Zoning Ordinance.

If a plan is not prepared and adopted by the municipality within the three (3) year period, Cook County will continue to plan for the property until a municipal plan is prepared and adopted, or until the property becomes annexed to the municipality, whichever occurs first. Cook County retains its zoning jurisdiction over all unincorporated land, but will zone property in general conformity with the merits of applicable municipal plans if the above procedure is followed.

b. UNINCORPORATED LAND CONTIGUOUS AND ADJACENT TO ONE MUNICIPALITY, AND CONTAINING 60 ACRES OR LESS

When a parcel of unincorporated land is contiguous and adjacent to only one (1) municipality, and contains sixty (60) acres or less, the same procedure as in 'a' on the previous page shall be followed."

In his opinion the provision did not apply although the subject site is contiguous to the village and contains less than 60 acres, because the subject site is part of an unincorporated area of more than 60 acres.

Stern was also cross-examined on the facilities available to the property, a factor mentioned but not developed on direct examination. The property is two miles from the Long Grove fire house. The fire department is a volunteer force. Stern did not know how many members or pieces of equipment the fire department had. At full development the project would generate about $9000 in revenue annually to the fire district. The Cook County sheriff's department would furnish police protection, to what extent he did not know. No cost-benefit analysis was ever presented on behalf of the developer.

Stern testified that approximately 1113 people would occupy the proposed development. He did not know how many dollars would accrue to the school district per pupil as a result of the project, or what the cost of education was per pupil. He stated that the recently rezoned

Bestmann property was going to be developed at a density of 18.63 units to the acre, or 223 units. He admitted that a major thoroughfare could be a proper dividing line between zoning districts and that there were no multiple-family units authorized in the northeast quadrant east of Wilke Road. But the influence of the Route 53/Dundee Road interchange would be for intensive, higher density uses. He characterized the Honeywell plant as an intense use. It covers 14% of the ground as opposed to the 8.9% coverage of the proposed development, and it has an adverse influence on the subject site. When he was employed by Arlington Heights, he recommended the Buffalo Creek area be developed for residential purposes at a moderate density of eight units per acre overall. The density of the proposed development is 10.2 units per acre, but because of the single-family development of the Tiburon and Kennedy Brothers tracts, the overall density in the area would be consistent with his recommendation. He was also a member of the county staff that made the R-4 recommendation for the subject property in 1975; but he changed his opinion to multifamily PUD because of the rezoning and extensions of roads in the area and the need for multiple-family dwellings. At the time the R-4 recommendation was made, his group had been instructed generally to carry forward existing zoning, and this was just one parcel within 237 square miles of unincorporated county land.

Dixon O'Brien, a soil and foundation engineer, testified that the site was satisfactory for the type of construction proposed for industrial development, and that no gas was escaping from the landfill.

Carl Kupfer, a civil engineer, also testified for plaintiff. He stated the development could be adequately serviced with sewer and water based on the capabilities of the Ferndale Heights Utility Company, and could also be adequately provided with storm water drainage based on the regulations of the agencies having jurisdiction.

Kupfer stated the property rolls gently in a southeasterly direction toward a fairly steep hill above the creek, the lowest point on the property. Approximately 20 acres could be developed without relocating the creek; if relocation were granted, approximately 36 acres would be buildable. The cost of relocation would be about $98,000. From an engineering standpoint, the proposed development would have no adverse impact on the surrounding property.

On cross-examination, he testified that the Ferndale Heights Utility Company has a capacity approximately four or five times the present usage, and no additional wells would be necessary. The water line extends to the northwest corner opposite the property now. He first submitted his application for a creek location permit in the fall of 1977; the Department of Transportation requested changes from his initial plan, which changes were made and resubmitted. After relocation, under the

Cook County zoning ordinance, the 20 acres will be floodway, which can be used for recreational purposes. The preliminary water, sewage and drainage plans submitted did not take into consideration village subdivision requirements.

Terrence O'Brien, a real estate appraiser, testified for plaintiff. In his opinion, the highest and best use of the subject property was a multiple-family development similar to plaintiff's proposal. Trend of development was the most important factor to him. The predominant use in all but the southeast quadrant of the Route 53/Dundee Road interchange was multiple-family. Prior to 1967 there were no improvements west of the landfill in the northeast quadrant. Since the development of the Honeywell site in 1969, no industrial use has been introduced in the northeast quadrant. However, two R-8 multiple-family uses and an R-5 single-family PUD have been introduced northwest and north of the subject property. In addition, the Bestmann property had recently been rezoned to R-7 multiple-family PUD. The present R-4 zoning he considered a "holding zoning," and one which did not develop the site to its highest and best use. O'Brien knew of no development of land zoned R-4 in the whole northwest area of the county where public water and sewer were available. Availability of utilities was an important fact, as was the need for apartments in the area, where his informal study showed a 99.9% occupancy rate. He also found that six-unit apartment buildings had been selling in the area. The physical characteristics of the site, primarily the creek, dictated a cluster of improvements and application of the density of the improvements over the entire 56 acres.

O'Brien considered other uses for the property, including single-family residential, manufacturing, office, research, commercial, and industrial uses, none of which would develop the land to its highest and best use. He stated the fair market value of the property under its existing R-4 zoning was $673,000 while the value of the property if zoned as requested would be $1,984,000. He considered the factors mentioned above as well as comparable sales in arriving at those values. The comparable sales for his single-family value were of tracts consisting of 65, 48, 73, and 40 acres. The proposed use would have no adverse effect upon the surrounding properties.

On cross-examination, O'Brien stated that he testified before the county board that the value of the property as zoned was $895,000, and not $673,000, but he explained the difference was due to his assumptions at that time that the floodway had already been corrected and that the amount of useable acreage would be 40 rather than 36 acres. He stated the subject property would be worth $754,000 if zoned M-1A in Arlington Heights or under similar county zoning classifications. His opinion of the value of the property if developed in the same manner as the Tiburon

PUD or the Kennedy Brothers development was $835,000. O'Brien did not know the total number of units authorized in the multiple-family PUDs in the northwest and southwest quadrants. The actual number of units in place was approximately 2300, with roughly 900 additional units under construction, and there was practically no vacancy. In his opinion there was great need and demand not only for sales, but for rental; there were waiting lists for rental units and buildings were selling before they were built.

O'Brien testified that he considered the Cook County comprehensive plan, which denoted the property as residential multiple-family with open space, potentially a PUD. He too found an ambiguity between the text and map of the Arlington Heights comprehensive plan. He understood that houses in the Tiburon PUD were priced in the neighborhood of $80,000 to $100,000, while the Kennedy Brothers development was still in the conceptual range and prices were not established. He did not consider profit to the owner in arriving at his opinion of highest and best use.

Plaintiff also called Gerald Lindgren, a traffic engineer. Lindgren stated that the major access roads to the proposed site would be Nichols Road, which runs along the north of the property, and Wilke Road, which runs along the west. These roads, at these points, are under Wheeling Township jurisdiction, but the sections of Nichols Road extending east past Schaeffer Road to Arlington Heights Road and of Wilke Road extending south to Dundee Road are both in Arlington Heights. Nichols Road has a pavement width of 18 feet, while Wilke Road has a pavement of 24 feet. Because of the construction going on in the area, both roads have some potholes and some breaking up of pavement, and are in need of repair.

Lindgren described the internal circulation of the proposed development as good and the emergency vehicle access as adequate. In his opinion, the development would have no adverse effect on Wilke Road, but the 18-foot pavement width on Nichols Road would not accommodate the volume of traffic the project would generate. He recommended improvement of Nichols Road to a 24-foot pavement width providing one lane of traffic in each direction, which would adequately handle the traffic generated by this and other developments. As to other access roads, the development would have a relatively insignificant impact on Dundee Road. Traffic was congested at the corner of Dundee and Wilke, which might make it difficult for traffic to gain access to Dundee Road, but that congestion had been relieved by construction of a Route 53 loop ramp. Any effect on Arlington Heights and Schaeffer Roads and Route 53 would be very minor and not adverse. Ongoing improvements of Arlington Heights Road and Lake-Cook Road

would also relieve congestion on Dundee Road. In his opinion, the proposed development would not, from a traffic standpoint, have any adverse effect upon surrounding property.

Lindgren's traffic counts showed an increase in traffic on Dundee Road as a result of the closing of Arlington Heights Road. The level of service at the Dundee Road/Route 53 interchange was very poor. Traffic on Wilke Road was higher than before and the volume of the traffic had changed to construction traffic. He did not specifically consider the R-7 PUD to be built on the Bestmann property in preparing his testimony, but he anticipated a total of 800 units west of Wilke and around Nichols Road. He did not know if there was any existing right-of-way for widening Nichols Road along the subject site, but he understood an 80-foot right-of-way for Nichols Road had been accepted by Arlington Heights in connection with the Kennedy Brothers development. Lindgren's traffic count during the one-hour peak periods in the morning and evening showed 90 to 100 vehicles on Nichols Road east of Wilke. The projected additional flow would be approximately 95 to 100 vehicles, slightly higher in the evening. The only existing traffic on Wilke Road is 110 to 125 vehicles in either of the peak hours; the project would add approximately 270 to 275 vehicles in the morning, slightly more in the evening. Lindgren was not aware of any specific funds for maintenance or improvement of Nichols or Wilke Roads. Wilke Road in its present condition was adequate to handle the traffic to be generated by the project, but it was in need of maintenance. Extension of Wilke Road to Lake-Cook Road would improve access to the proposed development and provide additional relief on Dundee Road. In Lindgren's opinion, the road network was sufficient to serve the proposed development, except that widening Nichols Road to 24 feet would be necessary for any development. The project would generate between 3000 and 4000 trips per day. A light industrial development would generate 2000 trips per day, while office-research use would generate up to 3600 trips per day. The Honeywell facility actually generated more than twice the peak hour trips projected for the proposed development. If the site were developed with 80 single-family units, there would only be about 800 trips per day. The development might make it necessary to add turning lanes on Wilke Road, which would probably require additional pavement and perhaps additional right-of-way. He did not know the existing right-of-way of Wilke Road.

Steven Lenet, a city planner and zoning consultant, testified for defendants. He prepared a land use and zoning exhibit which did not reflect the rezoning of the Muss property to R-7 PUD or the rezoning of the Kennedy Brothers development. His description of the subject property and surrounding area was substantially in accord with Stern's

testimony, except Lenet stated that the site was flat with little topography until it dropped off into Buffalo Creek. He added that Route 53 had been established as the planning boundary between the villages of Palatine and Arlington Heights; he believed Route 53 acted as a barrier between uses on its east and west sides. In his opinion, Arlington Heights' comprehensive plan map, recommending light manufacturing, office research, and open space, covered the subject site. He found no conflict between the text and map of the plan.

The gross density of the proposed development would be 10.2 units per acre. Using just the amount of buildable area, Lenet computed the net density of the proposed development as 28.8 units per acre. He conceded that the net density remained 10.2 units per acre under the Cook County zoning ordinance. But he pointed out that the project would cluster the units in the northwest portion of the site, close to one single-family development, and that the R-7 zoning classification plaintiff was requesting was not a transition zoning district under the county zoning ordinance.

In Lenet's opinion, the highest and best use of the land would be light manufacturing and office research similar to the Honeywell facility zoned M-1A in Arlington Heights. The size of the site and its location near the Route 53/Dundee Road interchange favored industrial use. He stated that the creek could be relocated to the north and west to act as a buffer between industrial and single-family residential use. He admitted plaintiff's proposal followed the existing flood plain while his would be exactly opposite. He also was mistaken as to the direction the creek flows. Nevertheless, he stated the cost would be the same.

Lenet projected the development would have 1480 future residents, approximately 370 more than plaintiff's estimate. In his opinion, police and fire service would be inadequate to serve that site because of its density and its distance from the fire house. He also testified that the development would have an adverse impact on the traffic in the area, although the trial court refused to recognize him as a traffic expert. He did not know if Honeywell generated more trips at peak hours than would the proposed development, nor did he know if an industrial development on the proposed site would generate more trips than residential. He further stated that Nichols Road was not proper for industrial traffic although Wilke Road could handle it. He admitted that the existing R-4 zoning was not the highest and best use of the site, although an R-4 development could reasonably be built on the property.

On cross-examination, Lenet admitted that the Muss property was more suitable for manufacturing and visible from Route 53, yet it had been zoned industrial and remained vacant for 8 years. He testified that 113 acres zoned industrial were undeveloped in the northeast and

southeast quadrants. He admitted that on the basis of recent rezonings the trend of development in the area was residential, and that multiple-family predominated over single-family within a square mile of the property.

In Lenet's opinion, the subject property would be worth $2,000,000 if zoned industrial. The cost of bringing utilities to the site would be the same. He felt that an M-1A zoning classification would be more compatible with surrounding land uses. He stated Kenroy Industrial Park in Arlington Heights bordered on a single-family development. He knew of no industrial development for small users that owned and maintained common open space.

David C. Grupp, chief of the Long Grove rural fire protection district and a consulting fire protection engineer, also testified. The district covers a 20-square mile area. Approximately three-fourths of one mile of this area is located in Cook County. If plaintiff's proposal proceeds, Cook County would then generate $14,000 in revenue to the district. The district has a volunteer force of 33 members, of whom 10-15 are available to respond in the daytime, 20-26 at night. The traveling distance to the site is four miles; travel time is five to six minutes, and would be up to a minute longer when Route 53 is extended. A travel time of four minutes is best. The district has three fire engines, two ambulances, one rescue vehicle, and one pickup truck. It has no hook-and-ladder or snorkel equipment to facilitate a fire attack on three-story buildings, whether multiple-family or office buildings. From a fire protection standpoint, it was his opinion that multiple-family developments, including the one proposed, should not be located in unincorporated areas. Residential developments create more alarms than industrial developments. He admitted that there were many other multiple-family developments in the districts, and that the district must service every user, regardless of the type of use.

Edmond Dobbs, chief of the Cook County sheriff's police department, testified that the subject property is part of a police beat covering 3.5 square miles. The area is assigned one car around the clock; it should have at least five squad cars, and an addition of 1100-1400 residents would increase the need for police services, which are already inadequate to service all the unincorporated areas in Wheeling Township. Multiple-family developments generally create more calls for police services than industrial developments. Any kind of development would increase the need for police services. To his knowledge, there had been no increase in the county's police budget for this area since 1972.

Francis S. Lorenz, Jr., a real estate appraiser, also testified on behalf of defendant. In his opinion the highest and best use of the subject property would be industrial. He stated the present R-4 zoning was uneconomical and not the highest and best use of the land. All the other

property zoned R-4 in the vicinity had been rezoned to allow more dense residential and industrial development. But he did not feel other residential uses of a higher density were suitable because of the Honeywell property and the impact of Route 53. The roads and the water and sewer facilities available lent the property to an industrial development. He felt the continuation of M-1A zoning up to Nichols Road would be logical. He opined that the proposed development would have a negative impact on the area generally since it would draw more government services than the amount of tax dollars it would contribute. It or any residential development would have a negative impact on the value of the Muss property for industrial development as presently zoned M-1A in Arlington Heights. In his opinion as an appraiser, and not a traffic expert, the traffic generated by the proposed development would adversely affect the single-family residential property being developed to the east along Nichols Road.

Lorenz thought the value of the property under an industrial use would be $1,620,000. Under an R-4 use, the value would be $720,000; under R-5, $900,000; and under the R-7 proposed, $1,850,000. He did not know the demand for or occupancy of multiple-family developments in the area, nor the number of acres zoned industrial that were sold or remained unsold. The comparable sales on which he based his estimate of value were of parcels of 5-6 acres. The property was less marketable because of its location on a secondary street. He admitted the trend of development in the area was residential and that the trend was toward multiple-family along Route 53, but said that did not affect the subject property. He also stated that the single-family Tiburon PUD would have a negative impact on properties zoned industrial such as the Muss property. The market for industrial property in the northwest suburban area had been weak, especially for vacant land, but in the last two years the market had greatly loosened. He did not know how much land zoned industrial was for sale at the present time.

In rebuttal, Terrence O'Brien, plaintiff's real estate appraiser, testified that there was not as good a market for industrial land in the area as there had been prior to 1975. He stated that the lack of visibility of the subject property would deter large industrial users; only small users requiring one to three acres would locate on a site in this location.

Finally, defendant called Joseph Kesler, the village planner of Arlington Heights, to testify. He incorrectly testified that the subject site adjoins the village on only two sides, the east and south. He would recommend the site be zoned M-1A if the property were annexed to the village. This would conform the village's comprehensive plan. He suggested M-1A zoning because the village needs industrial land. The village contains 118 acres available for industrial development and for

sale. Additional industrial land would improve the tax base. Industrial land would bring in the same revenue as the proposal but would generate less costs. He also thought that there was already enough land zoned multiple-family in the four-quadrant area, from a planning standpoint. At the end of 1977, a total of 5837 multiple-family dwellings had been approved. Of these, 4451 units were built. In the unincorporated area, there were only about 417 single-family units approved or built. In Arlington Heights, the existing ratio of single-family to multiple-family was 68 percent to 32 percent. He testified generally there was a strong demand for industrial sites in the Arlington Heights area, as well as single-family residences, but no demand for additional apartments in the four-quadrant area. He also testified generally that the project could create too dense a concentration of multiple-family units in the area; this would cause problems to the detriment of adjacent property.

Kesler computed the net density of the proposed development as 28.54 units per acre, by deducting the amount of land for streets from the buildable area. But he admitted that use of his method was merely a village policy and that using a common method of computing net density would result in a net density of 12.5 units per acre. He also admitted the trend of development in the northeast quadrant was multiple- and single-family residential. Arlington Heights departed from its comprehensive plan in rezoning the Kennedy Brothers property and probably in some other instances. Kesler stated that in the last five years, Cook County had not followed Arlington Heights' plan in any rezonings in the northeast quadrant; the land comprising the Tiburon PUD, which the village had also designated M-1A in its plan, was one example.

■■ After hearing argument, the trial court acknowledged that the burden was on plaintiff to show by clear and convincing proof that the zoning ordinance was invalid as it particularly restricted plaintiff's proposed use of the land. The court expressly evaluated the proposed use and its restriction in light of the six factors enumerated in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47, 145 N.E.2d 65, including the existing uses and zoning of nearby property; the extent to which property values were diminished by the particular zoning restrictions; the extent to which the destruction of plaintiff's property values promoted the health, safety, or general welfare of the public; the relative gain to the public as compared to the hardship imposed on the property owner; the suitability of the property for the purposes zoned; and the length of time the property had remained vacant as zoned considering land development in the area. The court stated the trend of development in the area was residential, predominately multiple-family, and no industrial development had taken place in the last 10 years; the court generally found the proposed use reasonable and the present

zoning unreasonable in light of the existing uses and zoning of nearby property, and the proposed use would have no adverse effect on the surrounding area. The court determined the value of plaintiff's property was diminished by the presence of the Honeywell plant and the landfill and the cost of relocating the creek; the proposed PUD would give greater value to plaintiff than development of the property as zoned or as industrial property. The court stated it considered the density of the project and the project would not adversely affect the safety or welfare of the public with regard to traffic, sewer or water, and police and fire protection. The court found a need for multiple-family development in the surrounding area and on the proposed site, and therefore benefit to the public. The court found the property unsuitable not only for the purpose zoned, but for industrial use, because it would adversely affect the residences to the north and west, it would not be economically feasible, and there was no market for industrial property. The court also noted plaintiff's proposal was in accord with Cook County's comprehensive plan, but found that Arlington Heights' plan was ambiguous and had not been followed in several instances. Finally, the court stated there had been attempts over several years to sell the property as industrial or as zoned, and the property had not been sold, despite the fact that property in the area was being developed for multiple-family residences. The court held that the proposed use was reasonable and that plaintiff had shown, by clear and convincing proof, that the zoning ordinance was unreasonable as applied to plaintiff's proposed development. From the judgment of the court, declaring the ordinance void as applied to plaintiff's proposed use and enjoining the county from interfering with such use, only the intervenor-defendant village has appealed.

Notwithstanding the posture of this appeal, in which the county has not joined in support of its ordinance and in which the parties concede the existing R-4 zoning is unreasonable, the burden remained on plaintiff to prove by clear and convincing evidence that the zoning ordinance was invalid insofar as it prohibited plaintiff's proposed use. (See, *e.g.*, *Schultz v. Village of Lisle* (1972), 53 Ill. 2d 39, 41-43, 289 N.E.2d 614.) On the other hand, it does have to be shown that the restriction is reasonably related to the public health, safety, or welfare to sustain the ordinance's validity in such a case. (*E.g.*, *Hoekstra v. City of Wheaton* (1975), 25 Ill. App. 3d 794, 798, 323 N.E.2d 124.) The findings of the trial court in making these determinations cannot be disturbed unless they are manifestly against the weight of the evidence. *E.g.*, *Standard State Bank v. Village of Oak Lawn* (1963), 29 Ill. 2d 465, 471, 194 N.E.2d 201; *Northern Trust Co. v. City of Chicago* (1954), 4 Ill. 2d 432, 436, 123 N.E.2d 330.

▬▮ Although the trial court applied the correct standard, we believe its determination that the prohibition of plaintiff's proposed PUD was not reasonably related to the health, safety, or welfare of the community was against the manifest weight of the evidence. While the existing R-4 classification is admittedly inappropriate for development of the property, its retention by the county is a legitimate means of controlling growth in undeveloped areas. (See *National Boulevard Bank v. Village of Schaumburg* (1979), 76 Ill. App. 3d 388, 397, 394 N.E.2d 1320, *appeal allowed* (1980), 79 Ill. 2d 626; see also *People ex rel. Trebat v. City of Park Ridge* (1969), 110 Ill. App. 2d 404, 413, 249 N.E.2d 681.) A governmental body may reasonably restrict increased population density as necessary for its health, safety, and welfare. (*La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 430, 312 N.E.2d 625.) As this court has stated, "[s]uch regulations prevent congestion of population, secure quiet residence districts, expedite local transportation and facilitate the suppression of disorder, the extinguishment of fires and the enforcement of traffic and sanitary regulations, all of which have a direct bearing upon, and substantial relation to, the public health, safety, morals or general welfare of the community." *Littlestone Co. v. County of Cook* (1974), 19 Ill. App. 3d 222, 237, 311 N.E.2d 268, *cert. denied* (1975), 420 U.S. 929, 43 L. Ed. 2d 401, 95 S. Ct. 1130.

It is precisely upon these points that the findings of the trial court are wholly general and without support in the record. There was ample testimony that existing roads, police protection, and firefighting capabilities are all inadequate to serve the proposed PUD. The fact that they are already inadequate is no justification for making the situation worse. Plaintiff argues that any development would increase the demands on the roads and the police and fire departments, but this is clearly a matter of degree, as a multiple-family development of the density proposed would generate more trips per day and far more police and fire calls than would small lot single-family or light industrial developments. It is apparent that plaintiff's project would not generate sufficient revenue to pay for the new firefighting equipment, the increased police protection, and the widening of Nichols Road made necessary by the project, and the record reflects no specific commitment on the part of the developer to help with the expense. Plaintiff contends that the governmental bodies responsible can levy additional taxes or incur additional indebtedness, but no reason is advanced why others should bear the costs of plaintiff's development. Plaintiff also suggests that neighboring municipalities, such as Arlington Heights, will provide additional safety protection. The village does not deny that it would provide such assistance, if required, but contends that this increased burden on it further militates against permitting a high density multiple-family development in an adjacent

unincorporated area. Even if we accept the trial court's determination that the village's comprehensive plan does not apply, there can be no doubt that the presence of a sizeable PUD on the village's borders will have substantial impact on the village. (*City of Urbana v. County of Champaign* (1979), 76 Ill. 2d 63, 70, 389 N.E.2d 1185.) This is particularly true where, as in the case at bar, the village surrounds the subject site on three sides; therefore, we find merit in the village's argument.

■■ Furthermore, while plaintiff does not have the burden of showing that alternative zoning classifications are unreasonable (*e.g., First National Bank v. Village of Morton Grove* (1973), 12 Ill. App. 3d 589, 595-96, 299 N.E.2d 570), the feasibility of using the property for alternative purposes remains a factor and reinforces our conclusion. (See *National Boulevard Bank v. Village of Schaumburg* (1979), 76 Ill. App. 3d 388, 399-400.) Even if the property is not suitable for single-family homes on half-acre lots or for use as a large industrial site, the uses for which plaintiff attempted to market the property, developments with single-family homes on small lots or even small industrial sites remain feasible alternatives. Plaintiff's testimony that the cost of creek relocation would be too great a burden for anything but a multiple-family use to absorb is vague and unsubstantiated. Plaintiff's own expert placed the cost at $98,000, a relatively small figure when spread over 36 acres of small lot single-family homes (conservatively estimated at 108 homes) or a number of small industrial sites. Neither is there anything in the record to indicate why an association of homeowners or small industrial users would be any less willing or able to maintain the resulting common open space than the apartment dwellers or 6-flat owners plaintiff posits; of course, maintenance by a park district would be equally possible in any case. In view of the facts that the existing uses bordering the property are industrial, proposed park land, and single-family, and the trend of development in the immediate area, except along Route 53, is undoubtedly small lot single-family, the feasibility of using the property for these purposes, which would create fewer demands on the police and fire departments and roads in the area, is significant. While prohibition of the proposed high density PUD would result in a substantial loss of value, this is virtually always the situation where a more intensive use is being sought. (*National Boulevard Bank v. Village of Schaumburg* (1979), 76 Ill. App. 3d 388, 398; *Littlestone Co. v. County of Cook* (1974), 19 Ill. App. 3d 222, 238.) And in the case of a seasoned developer who acquired the property with full knowledge of its zoning and topography, as here, it is well to remember that the "loss in value" is more likely merely a reduction in profit, and one that is the self-created result of a calculated business risk. See *Parkway Bank & Trust Co. v. County of Lake* (1979), 71 Ill. App. 3d 421, 425, 389 N.E.2d 882.

Because it appears that the prohibition of plaintiff's proposed use is reasonably related to the health, safety, and welfare of the community, and the reasonableness of plaintiff's development is, at best, debatable, the judgment of the trial court must be reversed. See *Schultz v. Village of Lisle* (1972), 53 Ill. 2d 39, 289 N.E.2d 614; *Standard State Bank v. Village of Oak Lawn* (1963), 29 Ill. 2d 465, 194 N.E.2d 201.

Reversed.

PERLIN, P. J., and DOWNING, J., concur.